**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION**

**CHARLES RAY "CHUCK" CRAWFORD**                               **PETITIONER**

**VS.**                                                   **CIVIL ACTION NO.: 3:04CV59-SA**

**CHRISTOPHER B. EPPS, ET AL.**                               **RESPONDENTS**

## MEMORANDUM OPINION

Petitioner Charles Ray "Chuck" Crawford filed the instant petition for writ of habeas

corpus under 28 U.S.C. § 2254 seeking to challenge his otherwise final conviction and sentence of

death for the 1993 capital murder of Kristy D. Ray.[1]

### Factual Background and Procedural History

The events that led to Petitioner's conviction and sentence of death in the instant case

began during the evening hours of January 29, 1993, when twenty year-old Kristy D. Ray was

abducted from her parents' home in Chalybeate, a small community in Tippah County,

Mississippi. (*See, e.g*, Trial Tr. Vol. 6, 422-429).[2]   At the time of Kristy Ray's disappearance,

Petitioner was only four days away from a trial date on unrelated charges of aggravated assault

and rape, which stemmed from events occurring in December 1991.  (*See* Pet. Memo, Ex. E; *see*

---

[1] Docket entry no. 5.

[2] There are thirteen consecutively numbered volumes and three supplemental volumes
that have been filed with the Court as comprising the State court record.  The Court notes that the
first three volumes of the transcript actually contain State court papers from trial, but the Court
refers to "Trial Tr. Vol. ___" throughout this opinion to refer to the consecutively numbered
volumes.  The supplemental volumes are hereinafter referred to as "Trial Supp. Vol. ___."  The
record also contains pleadings, exhibits, and orders that were submitted to the Mississippi
Supreme Court on both direct appeal and post-conviction review.

*also Crawford v. State*, 787 So. 2d 1236 (Miss. 2001)).  Petitioner's family retained an attorney, William R. Fortier, to represent him on the aggravated assault and rape charges, and Petitioner had been evaluated by the Forensic Services Unit at the Mississippi State Hospital after he had given notice of his intention to offer a defense of insanity at that trial.  (*See* Trial Tr. Vol. 4, 18; *see also* Pet. Memo, Ex. E).  Due to events that occurred in connection with the instant case, Mr. Fortier was granted leave to withdraw from his representation of Petitioner on February 3, 1993.  (*See* Trial Tr. Vol. 9, 884).  Petitioner stood trial for the aggravated assault charge in May 1993.  *See Crawford v. State*, 787 So. 2d 1236 (Miss. 2001).  He was tried separately for the rape.  (*See*, *e.g.*, Trial Tr. Vol. 12, 1233).  He was convicted on both charges and sentenced to sixty-six consecutive years as a result of both convictions.  (*See id*).  Judge R. Kenneth Coleman presided over both trials, and James W. Pannell was appointed as his defense counsel in both prior trials.  (*See* Trial Tr. Vol. 4, 173 and Trial Tr. Vol. 12, 1216).  Petitioner offered a defense of insanity in his aggravated assault trial, and Dr. L.D. Hutt testified at the trial that Petitioner was insane at the time of the crime.  *See Crawford v. State*, 787 So. 2d 1236 (Miss. 2001).

On April 18, 1994, Petitioner's trial for the capital murder of Kristy Ray began in the Circuit Court of Lafayette County, Mississippi, where it was held on a change of venue, with the Honorable R. Kenneth Coleman presiding.  Petitioner was tried on a four-count indictment handed down in September 1993 by the Circuit Court of Tippah County for burglary of an inhabited dwelling (Count I), rape (Count II), sexual battery (Count III), and capital murder (Count IV).  Petitioner was indicted on the charges as an habitual offender.  At trial, Petitioner was represented by David O. Bell and James W. Pannell.  (*See* Trial Tr. Vol. 8, 670-71).

Petitioner was found guilty of all four counts in the indictment and sentenced to death for the capital murder. (*See* Trial Tr. Vol. 12, 1218 and Trial Tr. Vol. 13, 1391-92).[3]

On January 29, 1993, Kristy Ray arrived in Chalybeate from Northeast Community College, where she was a student, in time to visit her mother, Mary Ray, at the bank where Mrs. Ray worked. (See Trial Tr. Vol. 6, 419-20). Kristy and her mother left the bank separately at 5:15 p.m. with plans to see one another later in the evening. (*Id.*). Following an unsuccessful attempt to reach Kristy by telephone, Mary arrived home at around 7:00 p.m. that evening to find Kristy's car gone, a ransom note on the table, Kristy's bedroom in disarray, and the telephone lines dead. (*Id.* at 422-426). After a search for Kristy's whereabouts turned up nothing, Mary telephoned her husband and reported Kristy's disappearance to the Tippah County Sheriff's Department. (*Id.* at 428). Further inspection of the family's home showed that the screen to Kristy's bedroom window had been cut, and there was a stacking pallet leaned against the house outside the window to Kristy's room. (*Id.* at 428). By 11:00 p.m. that evening, Sheriff Paul Gowdy had requested the assistance of both the Mississippi State Highway Patrol and the F.B.I., in addition to the local law enforcement already working on the case. (*See* Trial Tr. Vol. 8, 622-24).

Earlier on the same day, Petitioner's family found a ransom note in the attic of the residence where Petitioner was living. (*See* Trial Tr. Vol. 9, 887). Petitioner's mother, his ex-wife, Gail, and his grandfather, John Lee Montgomery, met with Mr. Fortier at his law office. (*Id.* at 883). The family was fearful Petitioner was planning to kidnap someone and hold them for

---

[3] Petitioner also received a sentence of imprisonment of fifteen years for burglary of an inhabited dwelling, life for rape, and fifteen years for sexual battery, with all of the sentences to be served consecutively. (*See* Trial Tr. Vol. 13, 1391).

ransom. (*Id*. at 887). As a result of the conversation with Petitioner's family members, Mr. Fortier contacted the police and reported the possibility of a crime being committed. (*Id*.). The following day, on Saturday, January 30, 1993, Mr. Fortier's law clerk, Shawn Atkins, turned over Petitioner's mental health records to F.B.I. Special Agent Newsom Summerlin. (*Id*. at 885; *see also* Trial Tr. Vol. 4, 124-125).

By Saturday morning, a command post had been set up at the elementary school in Chalybeate, where local, state, and federal authorities were investigating Kristy's disappearance. (*See* Trial Tr. Vol. 8, 626). At approximately 7:00 p.m. on Saturday evening, officers stationed near the home of Mr. Miles, the former father-in-law of Petitioner, saw Petitioner approaching the residence. (*See* Trial Tr. Vol. 8, 627-28). Officer Wall and Officer Pickens of the Mississippi Highway Safety Patrol arrived at Mr. Miles' home as Petitioner was being arrested. (*See* Trial Tr. Vol. 7, 566, Trial Tr. Vol. 8, 628). At the time of his arrest, Petitioner was armed with a shotgun and a switchblade knife. (*Id.* at 628). Investigators Wall and Pickens took custody of Petitioner, and he was given *Miranda* warnings. (*See* Trial Tr. Vol. 7, 557 and Trial Tr. Vol. 8, 630-31). At that time, Petitioner was complaining of pain from an injury he alleged to have received when he fell in a dry well earlier in the day. (*See*, *e.g.*, Trial Tr. Vol. 8, 631).

Petitioner was transferred to the Chalybeate school command post, where he was given *Miranda* warnings and interviewed by F.B.I. Agent Joe Jackson along with Special Agents Tom Bush and Jim Maddock. (*See* Trial Tr. Vol. 7, 472-73, 475). Petitioner accepted Agent Jackson's offer to lie down to alleviate Petitioner's alleged back pain, and the interview was conducted with Petitioner lying on the floor. (*See id.* at 477-78). During the course of the fifteen to twenty minute interview, Petitioner indicated to law enforcement officials that Kristy was no longer alive,

and he agreed to lead officers to her body. (*See id.* at 481-82). Petitioner and other law enforcement officials left the command post around 8:00 p.m. to begin the search for Kristy's body, which included a walk of approximately forty-five minutes through "extremely rugged terrain" to get to the location where Kristy's body was ultimately found. (*See id.* at 483). Petitioner did not complain of injury while walking, and his only request was that authorities extinguish their flashlights so that he could get his geographical bearings. (*See, e.g., id.* at 483-84). Kristy's body was ultimately recovered from a location approximately 400 yards from an abandoned barn known as the Hopper Barn. (*See id.* at 560).

Kristy had been handcuffed with her hands behind her back around a cedar sapling, she was gagged with a sock, and her jeans were pulled down to around her knees. (*See* Trial Tr. Vol. 8, 636-38). At trial, pathologist Dr. Steven Hayne testified that Kristy died as a result of a single stab wound to the chest, which punctured her heart and left lung. (*See* Trial Tr. Vol. 7, 460). She also sustained scrapes to her legs, back, buttocks, chest, face, and wrists, and she had bruises on her lips. (*Id.* at 455-56). The injuries to her wrist were consistent with being handcuffed, and the scrapes to her front thigh occurred prior to death are were consistent with someone being dragged, attempting to flee, or resisting a rape. (*Id.* at 457-58). Kristy's body also showed wounds consistent with having been anally penetrated. (*Id.* at 466, 469). Dr. Hayne testified that the knife in evidence was consistent with the instrument that caused Kristy's death. (*Id.* at 461-63).

In the days following the recovery of Kristy's body, Petitioner gave two additional statements to law enforcement officials. On Monday, February 1, 1993, Petitioner gave a statement to F.B.I. agents during an interview conducted at the Union County Sheriff's Department. (*See* Trial Tr. Vol. 8, 677). Agent Summerlin conducted the interview with

5

Lieutenant Steve Williams of the Mississippi Highway Safety Patrol for the purpose of getting additional facts about the crime. (*See id.*). Agent Summerlin read Petitioner his *Miranda* rights, and Petitioner executed a written waiver of those rights. (*See id.* at 678). On February 1, 1993, Petitioner had resumed taking Lithium, a drug which he had been prescribed to take three times per day, but which he had not received since the day before Kristy Ray's kidnapping. (*See, e.g*, *id.* at 728-30). At trial, Agent Summerlin testified as to the substance of Petitioner's statements during the February interviews, as Petitioner's motion to suppress the statements had been denied prior to trial. (*See, e.g.,* Trial Tr. Vol. 8, 682-703).

Petitioner informed Agent Summerlin that he had gone to the Hopper Barn, where he had been stockpiling food and drinks for about a month, on the day of Kristy's disappearance to think about things related to an "upcoming event" about which he was worried. (*See id.* at 682-83). That morning, he was in possession of a shotgun, a Ka-Bar type knife, and a .22 revolver. (*See id.* at 684). Petitioner stated he went to the Hopper Barn and had a snack while thinking about his options. (*See id.* at 684). After considering and discounting the idea of running away or committing suicide, Petitioner stated he went for a walk and ended up in an unfamiliar area. (*See id.* at 684-85). Petitioner stated he suffered a blackout shortly thereafter, and when he came back to himself, he was standing in the Ray family's kitchen and could hear sobbing coming from a back bedroom. (*See id.* at 686). Upon entering the bedroom, he saw Kristy handcuffed on the floor, and he pulled a toboggan over his face so that she would not later be able to identify him. (*Id.*). Petitioner stated he was confused and did not know what had happened, so he forced Kristy into her car and they left the Ray home. (I*d.* at 686-87). Petitioner denied leaving or ever seeing the ransom note that was left at the Ray home. (*Id.* at 687). Petitioner stated that they abandoned

the car after driving around for awhile, and that they were making their way to the Hopper Barn when he fell into a sink hole and Kristy had to use his shotgun to help pull him free. (*Id.* at 689-90). Petitioner stated he realized he did not have his .22 revolver when he climbed out of the sink hole. (*Id.* at 691). Petitioner stated that he and Kristy spent the night in the Hopper Barn, where he told her about his chemical imbalance, and they discussed the Bible and other topics. (*Id.* at 710-11). At daylight, Petitioner looked outside upon hearing a siren, and he saw law enforcement vehicles driving away from the nearby home of his grandparents. (*Id.* at 692). Petitioner told Kristy it was "the law," and he assumed that they were looking for him, so he fled into the woods with Kristy following him. (*Id.* at 693). Petitioner stated Kristy followed him without force, but that she was trying to convince him to turn himself in to police. (*Id.* at 693). Petitioner stated he and Kristy hid behind an uprooted tree and talked for awhile, and that Kristy had convinced him to turn himself in, so he took off the mask. (*Id.* at 693-94). Petitioner stated that Kristy asked to be given the shotgun, as she did not want anyone to spot them and think he was a danger to her, so Petitioner complied. (*Id.* at 695). Petitioner stated he had another blackout, and he awoke on a stump in the woods, clothed in an insulated t-shirt and a pair of blue jeans. (*Id.* at 696). Petitioner stated that Kristy was lying at his feet with her hands handcuffed behind her back, and he knew she was dead. (*Id.*). Petitioner stated one of his socks was in her mouth, and she was fully clothed, except that she had on no shoes. (*Id.* at 697). Petitioner stated he drug her by her feet to an area where he could hide her body, and that her pants and underwear slid down as he drug her. (*Id.*). Petitioner stated he covered Kristy's body with brush to hide it. (*Id.* at 697-98).

Petitioner stated he began making his way out of the woods, and upon approaching the road, he saw a patrol car. *(Id.* at 698). Petitioner stated he still had the shotgun and the knife at

that point.  (*Id.*).  He stated he sat on the hillside and waited until the patrol car left so that he

could cross the road undetected.  (*Id.* at 699-700).  Petitioner stated he fell into an abandoned well

shortly thereafter, and that he used his Ka-bar brand knife to climb out of the well.  (*Id.* at 700-

01).  Petitioner stated the last time he remembered having his knife, the pistol holder, and the

scabbard is when he fell into the well.  (*Id.* at 701-02).  Petitioner stated that at that time he was

still in possession of his dark brown leather belt with "Chuck" imprinted on the back of it, and

which had a Harley Davidson buckle that read "Live to Ride, Ride to Live."  (*Id.* at 701).

Petitioner stated that he knew at the time of his arrest that he had been connected with Kristy's

disappearance, but that he denied knowing anything about it to give himself time to think about

what to say.  (*Id.* at 703).  Petitioner stated he knew that taking Kristy from her home was wrong,

but that he had no recollection of how she died.  (*Id.*).

Another interview was conducted on February 2, 1993, to determine the location of the

murder weapon and gain facts to attempt to verify Petitioner's story.  (*Id.* at 707).  Petitioner

described the pistol he lost as being a Taurus six-shot revolver in blue steel, which was the type of

pistol later introduced into evidence at trial.  (*Id.* at 706, 707).  On February 2, 1993, investigators

went to the areas where Petitioner indicated he had lost the knife and pistol.  (*Id.* at 708).

Although Petitioner claimed he lost the pistol at a different time and location than he lost the

knife, the gun and knife were ultimately found together.  (*See id.* at 734).

On February 7, 1993, the Revered Tim Wilbanks found a pair of shoes, men's underwear,

long-john bottoms, a pair of men's briefs, and a t-shirt in the area where Kristy's body was found.

(*See* Trial Tr. Vol. 7, 497-501).  On March 29, 1993, Chalybeate resident Joe Foster was

bushogging in a field approximately one-quarter of a mile from the Hopper Barn when he

discovered a knife and a pistol in a nylon holder on the ground. (*See id.* at 520). After searching the area where Mr. Foster had been bushhogging, law enforcement authorities found a belt with a Harley Davidson belt buckle and the name "Chuck" stamped on the back of it in a radius of five or six feet from where the pistol and knife were found. (*See id.* at 526-27). Various items of evidence were removed from the Hopper Barn and processed, and the evidence included hair fibers found on the bedding. (*See, e.g., id.* at 532-39).

The Mississippi Crime Laboratory conducted examinations of the known samples of head and public hair of both Kristy Ray and Petitioner with the hair recovered from the Hopper Barn. (*See id.* at 581-83). Testimony at trial demonstrated that the recovered head hairs exhibited the same microscopic characteristics as Kristy's known samples, and the recovered pubic and head hairs exhibited the same microscopic characteristics as the known samples taken from Petitioner. (*See id.* at 590, 594). Samples from the clothing in evidence, a vaginal swab taken from the sexual assault kit performed on Kristy's body, and known blood samples of both Kristy and Petitioner were forwarded to Cellmark Diagnostics for further testing. (*See* Trial Tr. Vol. 8, 602-13). The DNA extracted from the vaginal swabs and the men's briefs was matched to both Petitioner and Kristy Ray. (*See* Trial Tr. Vol. 9, 772-73). The long-john bottoms contained two separate DNA samples, one in the crotch area and one on the inside left leg. (*See id.* at 784-86). The sample from the left leg matched Petitioner's DNA, while Kristy's DNA was found on the sample taken from the crotch area. (*Id.*). The statistical estimate that a random person would share the DNA characteristics with the tested evidence was one in five hundred thousand. (*See id.* at 798-99).

Following the State's presentation of the evidence against Petitioner, Petitioner presented a defense of insanity. Dr. Stanley Russell, a psychiatrist with the Mississippi Department of Corrections who had been treating Petitioner in the prison hospital at Parchman since June of 1993, testified that Petitioner suffered from depression and psychogenic amnesia, a dissociative disorder characterized by long periods of time for which the sufferer has no memory. (*See* Trial Tr. Vol. 9, 822-826). Dr. Russell testified that Petitioner had begun receiving treatment for his mental illness in his youth, and he noted that Petitioner had undergone two hospitalizations and two forensic evaluations in connection with his mental illness. (*See id.* at 827-28). Dr. Russell disagreed that Petitioner suffered from Bipolar Disorder[4], a diagnosis Petitioner was given during one of his prior hospitalizations, and he noted that he had discontinued administering Lithium to Petitioner shortly after he began treating Petitioner at Parchman. (*See id.* at 828-831). Dr. Russell testified he had not witnessed Petitioner having a manic episode. (*Id.* at 831). Dr. Russell opined that Petitioner was competent, but that he lacked criminal responsibility for his actions at the time of the crime. (*See id.* at 845). Petitioner's grandfather, father, grandmother, and sister all testified that they had known almost all of Petitioner's life that he suffered from mental illness. (*See* Trial Tr. Vols. 9 and 10, 893-997).

In rebuttal, the State presented the testimony of Dr. Chris Lott, a psychologist employed part-time at the Mississippi State Hospital, who testified that he evaluated Petitioner on February 2, 1993, at the hospital and opined that Petitioner did not suffer from any bipolar illness. (*See* Trial Tr. Vol. 10, 1002-04). Dr. Lott had evaluated Petitioner on four occasions, the first of which

---

[4] At trial, the term "Bipolar Disorder," was used interchangeably with "manic-depressive disorder" and was described as being characterized by periods of depression alternating with periods of extreme excitement and agitation, or mania. (*See, e.g.,* Trial Tr. Vol. 13, 1306-07).

occurred in December 1992.  (*See id.* at 1012-14).  Dr. Lott disagreed with Dr. Russell's diagnosis

of psychogenic amnesia, and Dr. Lott opined that Petitioner's recurring loss of memory

represented a "selective deficit" that appeared only when an offense was taking place.  (*See id.* at

1013-16).  Dr. Lott further offered an opinion that Petitioner's behavior prior to the offense

indicated premeditation, and that Petitioner did not suffer a mental illness, but rather, "a character

pathology of antisocial, violent, aggressive, and potentially sexually predatory behavior."  (*Id.* at

1017, 1023, and Trial Tr. Vol. 11, 1056).   Dr. Reb McMichael, the director of the forensic

sciences unit at the Mississippi State Hospital, also testified in rebuttal to the defense's case-in-

chief.  Dr. McMichael also opined that Petitioner was malingering the symptoms of psychogenic

amnesia, and he agreed that Petitioner's behaviors prior to and following the crime suggested that

Petitioner knew his behavior was wrong.  (*See* Trial Tr. Vol. 11, 1066-72).

After the jury began deliberating the issue of guilt, the trial court held a hearing and found

Petitioner an habitual offender pursuant to Miss. Code Ann. § 99-19-181 for his prior convictions

of aggravated assault and rape.  (*See* Trial Tr. Vol. 12, 1215-17).  The jury found Petitioner guilty

on all four counts of the indictment.  (*Id.* at 1218).  During the sentencing phase of trial, the State

introduced Petitioner's two prior convictions through the testimony of Jim Wall, and Mary Ray

gave victim impact testimony.  (*Id.* at 1232, 1238-43).  Petitioner's father, paternal grandfather,

paternal grandmother, mother, maternal grandfather, maternal grandmother, step-mother, half-

brother, and sister all testified in mitigation.  (*See* Trial Tr. Vol. 12, 1247- 1279, 1302-1305).  Dr.

Martin Webb, a psychiatrist in private practice who was hired by Petitioner's family to evaluate

Petitioner approximately one year prior to trial, testified that he believed Petitioner suffered from

Bipolar Disorder and lacked criminal responsibility at the time of the crime.  (*See id.* at 1281-84).

11

Dr. Webb did not dispute Dr. Russell's diagnosis of psychogenic amnesia. (*Id.* at 1285-86). Dr. Russell also testified for the defense in the sentencing phase, reiterating his belief that Petitioner was operating under extreme duress and emotional disturbance at the time of the crime. (*Id.* at 1293). The State called Dr. McMichael to offer rebuttal testimony. Dr. McMichael testified that Petitioner has an antisocial personality and opined that Petitioner suffers from no mental illness that would reduce his responsibility for the crimes committed. (*Id.* at 1311-12).

The jury returned a sentence of death on April 23, 1993. (*See* Trial Tr. Vol. 13, 1386). The jury found the presence of three aggravating factors, and it found that Petitioner actually killed, attempted to kill, intended to kill, and contemplated that lethal force would be employed in committing the offense. (*Id.* at 1387, 1388). The Mississippi Supreme Court affirmed the sentence on direct appeal on March 12, 1998. *See Crawford v. State*, 716 So. 2d 1028 (Miss. 1998), *cert. denied*, 525 U.S. 1021 (1998) ("*Crawford I*"). After Petitioner filed a pro se petition for post-conviction relief, he was appointed counsel who filed a post-conviction application on his behalf. The petition was denied on December 4, 2003. *See Crawford v. State*, 867 So. 2d 196 (Miss. 2003), *cert. denied*, 543 U.S. 866 (2004) ("*Crawford II*"). Petitioner filed his petition for writ of habeas corpus in this Court on September 27, 2004.

## Applicable Standard

This petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 324-26 (1997) (AEDPA applies to all federal habeas applications filed on or after April 24, 1996). Pursuant to the AEDPA's scope of review, habeas corpus relief cannot be granted in connection with any claim adjudicated on the merits in State court proceedings unless that adjudication (1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the presented evidence. *See Schriro v. Landrigan*, ___ U.S.___, 127 S. Ct. 1933, 1939-40 (2007); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); and 28 U.S.C. § 2254(d)(1) & (2). The factual findings of the State court are presumed correct, and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d) have been held to have independent meanings. *See, e.g., Bell v. Cone*, 535 U.S. 685, 694 (2002); *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *See id.* at 407-08; *see also Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry, and it does not turn on whether the decision is merely incorrect. *See Schriro*, ___ U.S. at ___, 127 S. Ct. at 1939 ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Williams,* 529 U.S. at 410-11; *Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004) (habeas relief merited where state decision both incorrect and objectively unreasonable).

Habeas relief does not generally lie for rules of constitutional law which have not been announced or that were announced after the challenged conviction became final on direct review. *See Teague v. Lane*, 489 U.S. 288, 310 (1989). A new rule is not retroactively applied unless the United States Supreme Court holds the rule to be retroactive. *See Tyler v. Cain*, 533 U.S. 656, 663 (2001). It is a violation of the principles of *Teague* for a federal court to create new constitutional rules on habeas review. *See Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001).

A petitioner must exhaust his remedies in State court prior to seeking federal habeas relief. *See Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); 28 U.S.C. §2254(b)(1). A petitioner has exhausted his claim when he has fairly presented the claim for which he seeks relief to the highest court of the State. *See Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004). The federal claims presented for habeas relief must be the substantial equivalent of those presented to the State court in order to satisfy the requirement of fair presentation. *See Morris*, 379 F.3d at 204-05; *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999). A claim is not exhausted for purposes of federal habeas review if a petitioner presents the federal court with different legal theories or factual claims than those pursued in State court. *See Wilder*, 274 F.3d at 259 ("[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement."); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001). A federal court may not grant federal habeas relief on an unexhausted claim, but relief may be denied on an unexhausted claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Mercadel v. Cain*, 179 F.3d 271, 276 (5th Cir. 1999).

Where a petitioner fails to exhaust his State remedies, but it is clear that the State court to which he would return to exhaust the claim would find the claim procedurally barred, the claim is procedurally defaulted for purposes of federal habeas corpus relief. *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001); *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995). Likewise barred from federal habeas review are claims that the State court held procedurally barred on review on the basis of independent and adequate State law grounds. *See, e.g., Coleman*, 501 U.S. at 729-30 ("The doctrine applies to bar federal habeas claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests upon independent and adequate state procedural grounds."); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977). In order to receive federal habeas review of procedurally defaulted claims, Petitioner must demonstrate "'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Coleman*, 501 U.S. at 749-50 (internal citations omitted).

In order to demonstrate cause, a petitioner must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice may be demonstrated by showing that the errors "worked to [the petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (internal quotations omitted). If a petitioner is unable to demonstrate cause and prejudice, he may obtain review of his claim by demonstrating that the application of the procedural bar would result in a miscarriage of justice because he is actually innocent of the crime. *See House v. Bell*, 547 U.S. 518, 537-38 (2006). An allegation of actual innocence requires that a petitioner support his claim "with new, reliable evidence that was

not presented at trial and show that it was more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Fairman v. Anderson*, 188 F.3d 635, 655 (5th Cir. 1999) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Where a State court holds a claim barred on independent and adequate State law grounds and reaches the merits of the claim in the alternative, the bar imposed by the State court is not vitiated. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Hughes v. Dretke*, 412 F.3d 582, 592-93 (5th Cir. 2005) (alternate holding on merits by state court did not preclude imposition of bar on federal habeas review for petitioner's failure to contemporaneously object on federal constitutional grounds in State court); *Thacker v. Dretke*, 396 F.3d 607, 614 (5th Cir. 2005) (procedural bar imposed for petitioner's failure to contemporaneously object and preserve claim for review not circumvented by State court's alternative holding that constitutional claim lacked merit).

Finally, the Court notes that the AEDPA imposes the burden of obtaining an evidentiary hearing in federal court on the petitioner, and it limits the circumstances in which an evidentiary hearing may be granted for those petitioners who fail to diligently seek to establish the factual bases for their claims in state court. *See Williams*, 529 U.S. at 433-34 (prisoners at fault for deficiency in state court record must satisfy heightened standard to obtain evidentiary hearing); *Clark v. Johnson*, 202 F.3d 760, 765-66 (5th Cir. 2000); *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998); 28 U.S.C. § 2254(e)(2). Even where an evidentiary hearing is not precluded due to a petitioner's lack of diligence, the decision to grant an evidentiary hearing is discretionary. *See, e.g., Clark,* 202 F.3d at 765-66. In order to be entitled to an evidentiary hearing in federal

court, a petitioner must demonstrate that he was denied a "full and fair hearing" in State court and persuade the Court that his allegations, if true, would warrant relief. *Id.* at 766 (citations omitted).

With the foregoing standards in mind, the Court turns to Petitioner's specific claims for relief. This opinion addresses the Petitioner's alleged grounds of relief in the order in which they were briefed in Petitioner's memorandum in support of the petition.[5]

## I. Trial Court's Refusal to Suppress Confession

On February 2, 1994, the trial court held a hearing on defense counsel's ore tenus motion to suppress Petitioner's statements to law enforcement. (*See* Trial Tr. Vol. 4, 9-10). Petitioner testified at the hearing that he had repeatedly requested that law enforcement officials let him speak to his attorney, Mr. Fortier, prior to answering any questions. (*Id.* at 13-33). The State produced seven law enforcement officials who all testified Petitioner had not requested an attorney after being given his *Miranda* warnings. (*Id*. at 34-136). At the close of the testimony, defense counsel requested that the court allow them to renew the suppression motion if more information was discovered, and the court granted the request. (*Id*. at 137-38). The trial court found no violation of any constitutional or legal right of the defendant and denied the motion to suppress his statements. (Id. at 141). In his federal habeas petition, Petitioner makes four arguments in support of his claim that the trial court improperly refused to suppress his confession.

A. Confession Taken in Violation of Right to Attorney

Petitioner alleges that he was interrogated on three separate occasions over the course of three different days without the requested assistance of his attorney, William R. Fortier. (Pet.

---

[5] *See* docket entries no. 21-29.

Memo 8).  First, Petitioner maintains that he was interrogated on January 30, 1993, in violation of his Fifth Amendment right to have counsel present during the interrogation, despite his requests to speak to Mr. Fortier.  (Pet. Memo 9). Second, Petitioner alleges a violation of his Sixth Amendment right to have counsel present at his February 1, 1993, and his February 2, 1993, interrogations.  (Pet. Memo 12).  Petitioner argues that his Sixth Amendment right attached on February 1, 1993, when the general affidavit and arrest warrant issued that formally charged him with capital murder. (Pet. Memo 13).  Petitioner argues that Mr. Fortier, as retained counsel on the unrelated charges for which Petitioner was scheduled to stand trial on February 2, 1993, extended his representation of Petitioner by signing off on the circuit court's order that Petitioner undergo a psychiatric evaluation on the charges related to Kristy Ray's murder.  (*See* Pet. Memo 14-15 and Ex. E).

Third, Petitioner argues that even if Mr. Fortier was not representing Petitioner at the time of his February 2, 1993, evaluation at the Mississippi State Hospital, Petitioner was entitled to the assistance of counsel before submitting to an evaluation that the State later used to discredit his insanity defense.  (Pet. Memo 17-18).  Petitioner maintains that the State used Petitioner's statements to hospital personnel against him at trial, which violated his right against self-incrimination under the Fifth Amendment. (Pet. Memo 18).  Fourth, Petitioner argues that he was wrongfully denied an initial appearance, as he was arrested without a warrant and interrogated without being granted an appearance before a judge until February 3, 1993, after his confession was obtained.  (Pet. Memo 21-23).

On direct appeal before the Mississippi Supreme Court, Petitioner raised a claim that the admission of his confessional statements violated his Fifth and Sixth Amendment rights to

counsel. *See Crawford I*, 716 So. 2d at 1037. The court first determined that Petitioner had failed to address the Fifth Amendment claim in his brief and found the claim procedurally barred. *Id.* The court noted that while the trial judge did not make specific factual findings regarding the admissibility of the confession, the Sixth Amendment right to counsel attaches pursuant to the Mississippi Constitution when the proceedings have "reach[ed] the accusatory stage." *Id.* at 1037-38 (internal quotation omitted; citation omitted). The court noted that the right to counsel attaches when the initial appearance ought to have been held, and that the right to an attorney has to be exercised before an accused may complain that he was questioned in the absence of his attorney. *Id.* The court found it could read Petitioner's argument one of two ways. *Id.* The court noted Petitioner could be arguing that he was not subject to questioning outside of the presence of Mr. Fortier, who was representing him in another proceeding. *Id.* The court found, if that was the claim, that Mr. Fortier's representation did not extend to the instant case, as the Sixth Amendment right is offense-specific. *Id.* Two, and more likely, the court found Petitioner was arguing that proceedings had reached an accusatory stage because he was arrested without a warrant. *Id.* The court acknowledged that there was disagreement as to whether Petitioner had invoked his right to counsel, but it determined that the trial court's finding that the confessional statement was admissible was not in error. I*d.* Accordingly, the court found Petitioner's Sixth Amendment claim without merit. *Id.*

On post-conviction review, Petitioner argued that his court-ordered psychiatric evaluation was an interrogation in violation of his right to counsel. *See Crawford II*, 867 So. 2d at 204. The court noted that when an accused is not given a prior opportunity to consult with an attorney about his participation in a psychiatric examination, or the attorney receives no notice of the

examination or its scope, the accused is deprived of his constitutional right to the assistance of counsel. *Id.* at 205, citing *Estelle v. Smith*, 451 U.S. 454, 470-71 (1981). Citing the Fifth Circuit's decision in *Spivey v. Zant*, 661 F.2d 464, 474-76 (5th Cir. 1981), the court noted that the Sixth Amendment would also be violated if a defendant had no counsel at the time of an examination, or if the defendant was represented, his counsel was not given notice of the order. *Id.* The court found that, at the very least, Petitioner's counsel had notice, as he signed and approved the court's order. *Id.* The court determined that the "State upheld its end of the bargain" and found Petitioner's claim without merit. *Id.* The court also considered whether the admission of Petitioner's statements were error as he was not granted a timely appearance. The court found that even if Petitioner's right to a timely appearance was abridged, the record supported a finding that his rights were explained to him, and that he executed a written waiver of those rights. *Id.* at 206. The court found that the confessions were properly admitted and rejected Petitioner's claim.

*Id.*

The Court first considers Petitioner's claim that he was questioned in the course of a custodial interrogation without the requested assistance of counsel in violation of his rights under the Fifth Amendment, which includes Petitioner's claim that the interrogation violated the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966).[6] As Petitioner did not properly present his Fifth Amendment claim to the Mississippi Supreme Court, it is barred from federal habeas review on

---

[6] An accused's *Miranda* rights include "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. at 479.

the basis of an independent and adequate State law procedural bar.  *See, e.g., Coleman*, 501 U.S. at 729-30, 735 n.1; *Lowe v. Scott*, 48 F.3d 873, 875 (5th Cir. 1995).  Petitioner has not demonstrated that the bar should be overcome with regard to this claim, as he has not shown cause for the default or resulting prejudice.

However, an alternative consideration of the merits of this claim would not warrant relief.  When a custodial suspect has clearly expressed a wish to have the presence of counsel when dealing with authorities, all interrogation must cease unless and until the suspect makes a knowing and intelligent waiver of his right to counsel.  See, e.g., *Smith v. Illinois*, 469 U.S. 91, 95 (1984); *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *see also Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).  Inquiries regarding the admissibility of a confession following a waiver of request for counsel requires consideration of two questions.  First, whether the right to counsel was actually invoked; and second, whether the court has determined the suspect's responses admissible as the discussion between law enforcement and the suspect was (a) initiated by the suspect, and (b) a knowing and intelligent waiver of his right to the assistance of counsel.  *Smith*, 469 U.S. at 95.  Here, the issue is whether Petitioner affirmatively invoked his right.  *See Davis v. United States*, 512 U.S. 452, 460-61 (1994).  The determination of whether an accused has waived his Fifth Amendment rights is determined by the totality of the circumstances.  *See United States v. Laury*, 985 F.2d 1293, 1315 (5th Cir. 1993).

Implicit in the trial court's determination that Petitioner's statements were admissible was a finding that Petitioner's allegations were not credible.  At the suppression hearing, seven law enforcement officials testified that Petitioner was given his *Miranda* warnings, and that Petitioner never requested to speak to an attorney or invoke his right to silence.  (*See, e.g.,* Trial Tr. Vol. 4,

38-39, 40-41, 53-54, 55-56, 59-61, 65, 75-76, 86-87, 116-119, 132-33, 134-35). Petitioner also executed a written waiver on February 1, 1993, and on February 2, 1993. (*See* Trial Tr. Vol. 4, 116, 119). Each and every law enforcement official present during any of the three interviews conducted stated that Petitioner never requested an attorney or asked that the questioning cease. The record does not support a finding that the court erred in determining that Petitioner's statements were admissible.

In considering Petitioner's remaining claims, the Court notes that the Sixth Amendment right to counsel is "offense specific." *Texas v. Cobb*, 532 U.S. 162, 167 (2001). During the February interviews, Petitioner was only questioned about Kristy Ray's disappearance, and not the crimes for which he had retained counsel. The Sixth Amendment right to counsel attaches when "a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Cobb*, 532 U.S. at 167-68. Petitioner was charged with Kristy Ray's murder on February 2, 1993. The Court rejects Petitioner's argument that his Sixth Amendment right attached upon arrest, as an arrest does not solidify the government's adversarial position. *See Kirby v. Illinois*, 406 U.S. 682, 689 (1984). Even if the Court were to assume that Petitioner's Sixth Amendment right to counsel had attached at the time of the February interviews, the giving of *Miranda* warnings and subsequent waiver of the right to counsel meets the burden of making Petitioner aware of his right and the possible consequences of forgoing that right, thereby making the waiver sufficiently knowing and intelligent. *See Patterson v. Illinois*, 487 U.S. 285, 292-93 (1988). The record evidence supports a determination that if Petitioner had the right under the Sixth Amendment to counsel at the time of the February interviews, he did not invoke it. *See,*

*e.g., Michigan v. Harvey*, 494 U.S. 344, 353 (1990) ("Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will.").

An "Order for Psychiatric Examination" was entered by the trial court on February 1, 1993. (*See* Pet. Memo, Ex. E). The order noted that Petitioner was scheduled to stand trial on February 2, 1993, and that he had previously been evaluated by the Forensic Services Unit at the Mississippi State Hospital to determine whether he was sane and competent to stand trial on those charges. The order noted that in light of Petitioner's intent to offer a defense of insanity at the scheduled trial and due to the new charge of capital murder, another evaluation was warranted. (*Id.*). The order was signed off on and approved by William Fortier.[7] (*Id.*). Prior to the psychiatric evaulation, Dr. Lott informed Petitioner of the non-confidential nature of the examination, and the purpose of the examination was made clear in the order. (*See* Pet. Memo, Ex. F). Petitioner was notified of his rights under the Fifth Amendment prior to the examination, and the court's order notified Mr. Fortier of the purpose and scope of the examination sufficient to satisfy the Sixth Amendment. *See, e.g, Powell v. Texas*, 492 U.S. 680 (1989).[8]

The United States Supreme Court has held that a judicial determination of probable cause must be made "promptly" after a suspect's arrest, and that such a determination made within forty-eight hours of the arrest will generally satisfy the promptness requirement. *See, e.g., County*

---

[7] Mr. Fortier was allowed to withdraw from the case on February 3, 1993, and that is presumably when Mr. Pannell was appointed as a public defender to represent Petitioner. (*See, e.g.*, Trial Tr. Vol. 9, 883-84).

[8] The Court also notes that Petitioner had not been formally charged with capital murder at the time of his court-ordered evaluation on February 2, 1993.

*of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (hearing within forty-eight hours of arrest satisfies promptness requirement); *Gerstein v. Pugh*, 420 U.S. 103,125 (1973). However, whether a delay occurred is only a factor in assessing whether Petitioner's statement was given voluntarily. *See West v. Johnson*, 92 F.3d 1385, 1404-05 (5th Cir. 1996). The Court has already determined that Petitioner waived his *Miranda* rights prior to confessing his involvement to police, and that he did not invoke his right to counsel. Petitioner confessed his involvement in Kristy Ray's murder less than one hour after his arrest. There is no evidence of a causal connection between the asserted delay and Petitioner's confession. *See De La Rosa v. Texas*, 743 F.2d 299, 303 (5th Cir. 1984). The Mississippi Supreme Court found Petitioner's statement to police was given after he was fully apprised of his rights and waived them. *See Crawford II*, 867 So. 2d at 206. Petitioner has not demonstrated that he is entitled to relief under the AEDPA as a result of the Mississippi Supreme Court's decision, and he is not entitled to relief on this issue.

B. Confession Coerced by Denial of Medical Treatment

Petitioner asserts that his January 30, 1993, statement was coerced, as he was denied medical treatment for his back injury until he agreed to give a statement. (Pet. Memo 24-27). On direct appeal, the Mississippi Supreme Court found that the prosecution meets their burden of proving beyond a reasonable doubt that a confession was voluntarily given when testimony is presented by a person with knowledge of the facts that the statement was made without "without any threats, coercion, or offer of reward." *Crawford I*, 716 So. 2d at 1038-39. The court noted that all officers witnessing the statement testified that it was voluntarily given and that no medical attention was withheld. *Id.* Relying upon the implicit findings of the trial court, the Mississippi

Supreme Court determined that the State had made a prima facie showing that Petitioner's statement was voluntary. *Id.*

On January 30, 1993, Petitioner was interviewed at the command center set up at the Chalybeate school. F.B.I. Agent Jackson conducted the interview in a classroom in the back of the building with Agent Maddock and Agent Bush also present. (*See* Trial Tr. Vol. 4, 85). All three officers testified at Petitioner's suppression hearing, and each testified that the interview lasted approximately fifteen to twenty minutes. (*See, e.g.*, Trial Tr. Vol. 4, 63, 77, 90). At the suppression hearing, Petitioner testified that he had fallen into a well on January 30, 1993, and that he was in substantial back pain at the time he was arrested. (*Id.* at 13-14). Petitioner stated that he was forced to endure the interrogation while lying on the floor, and that his requests for medical treatment were denied. (*Id.* at 23-24). Petitioner stated that law enforcement officials informed him that he would get medical treatment when he provided the information they needed, and he alleges that he finally gave a statement when it became clear that he would not get medical treatment otherwise. (*Id.* at 24).

Following Petitioner's testimony at the suppression hearing, Agent Jackson testified. He denied that Petitioner was coerced, pressured, or threatened during the course of the interview, and Agent Jackson stated that he offered Petitioner the option of lying on the floor during the interview due to the back discomfort Petitioner had complained of when he arrived. (*Id.* at 87-89). Agent Jackson testified that after Petitioner had given his statement to officials, he navigated a very rough terrain in leading the search for Kristy Ray's body without complaint or apparent difficulty. (*Id.* at 91-92, 108-09). Investigator Wall, Investigator Pickens, Agent Bush, and Agent Maddock all testified that Petitioner was not coerced, threatened, or promised anything in

exchange for his statement. (*Id.* at 43-44, 56-57, 62, 65, 76-77). Investigator Wall, Investigator Pickens, and Agent Maddock all testified that Petitioner did not complain of back pain or appear to have any physical difficulty in leading the search team to the location of Kristy Ray's body. (*Id.* at 43, 56-57, 62, 65). Agent Bush testified that Petitioner was coherent and responsive during the interview, and he denied that medical treatment was withheld from Petitioner. (*Id.* at 76-77). Agent Maddock testified that while Petitioner had complained of injury when he was initially brought in, he did not recall Petitioner asking for any medical treatment. (*Id.* at 62-63).

When a confession is challenged on the grounds of voluntariness, the government must show that the waiver of rights was a choice made by the defendant's own rational choice and will in light of the totality of the circumstances. *See*, *e.g.*, *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (waiver must not be product of intimidation, coercion, or deception); *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973) (voluntariness of confession is determined by assessing the totality of the circumstances). On January 30, 1993, Petitioner was questioned for approximately fifteen to twenty minutes by law enforcement officials after being given his *Miranda* warnings. He was offered a place to lie down to make himself more comfortable, which he accepted. All law enforcement officials who played a part in the events leading up to Petitioner's confession on January 30, 1993, testified that Petitioner was not coerced, promised, threatened, nor was medical treatment withheld. Petitioner has not demonstrated an entitlement to relief on this issue.

C. Mental Health Records

Petitioner maintains that his private mental health records were illegally obtained in violation of the attorney/client privilege and then used to extract a coerced confession that was later used at trial. (Pet. Memo 27-28). On direct appeal, Petitioner argued that his mental health

26

records were subject to the attorney/client privilege under Mississippi Rule of Evidence 502(b), and that his statement was inadmissible as "fruit of the poisonous tree." *Crawford I*, 716 So. 2d at 1039-1040. The court noted that Petitioner had failed to make the records part of the appellate record, and that he could not therefore show that reversible error was committed. *Id.* at 1040. The court concluded it had no way of determining whether the records were privileged, but it found that Mr. Fortier, through his law clerk, turned over the records to law enforcement in a good faith belief that Petitioner was planning to commit a crime. *Id.* at 1040-41. The court determined that as the records were not illegally obtained, the confession was not invalid, regardless of whether the records were used in the course of the interrogation. *Id.* at 1041. The court found that Petitioner's constitutional rights were not violated, that no violation of the attorney client/privilege occurred, and that there was no error in the trial court's denial of Petitioner's motion to suppress the statement. *Id.*

Generally, where an illegal act leads to the discovery of evidence, the evidence derived as a result of the illegal act will not be admissible as "fruit of the poisonous tree." *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). As the records turned over to law enforcement officials are not made part of the record, this Court also finds itself unable to determine whether the records were privileged. However, the Court determines that Petitioner has not demonstrated that law enforcement officials engaged in any illegal act which led to disclosure of his records. Respondents argue that the complained-of records were most likely the evaluations conducted in anticipation of Petitioner's pending rape and assault trial, such that they would not have been confidential. (R. Memo 55). The record appears to support that conclusion. At the suppression hearing, Agent Summerlin testified that he believed the State to be in possession of the same

records as those obtained from Mr. Fortier's office, but as it was the weekend, it was quicker to get them from Mr. Fortier. (*See*, *e.g.*, Trial Tr. Vol. 4, 127). Moreover, the records, even if they were privileged, were disclosed in an attempt to prevent the commission of a crime. *See* Mississippi Rules of Professional Conduct, Rule 1.6(b)(1). Finally, Petitioner has presented no evidence that the disclosure of the records caused him to confess his involvement in the murder. Petitioner has failed to demonstrate an entitlement to relief on this claim.

D.  Lack of Probable Cause for Arrest

Petitioner maintains that he was arrested solely because of the ransom note his attorney gave to police. (Pet. Memo 30-31 and Ex. Y). Petitioner argues that the note, which was found in the attic of his ex father-in-law's home, did not bear his signature or reference Kristy, and his mother testified that she did not know if Petitioner had written the note. (Pet. Memo 31). Petitioner contends that any evidence obtained as a result of his arrest must be suppressed as fruit of the poisonous tree, as there was no probable cause for his arrest. (Pet. Memo 32).

This claim has never been presented in State court and is barred from federal habeas review. *See, e.g, O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (petitioner forfeits federal claim by failing to exhaust available state remedies). As Petitioner has no means by which to now raise the claim in State court, the claim may be considered exhausted and reviewed upon a demonstration of cause and prejudice for the default. *See, e.g., Gray v. Netherland*, 518 U.S. 152, 161 (1996); *see also* Miss. Code Ann. § 99-39-5(2) ("[F]ilings for post-conviction relief in capital cases . . . shall be made within one (1) year after conviction.") and Miss. Code Ann. § 99-39-27(9) (providing that "[t]he dismissal or denial of an application under this section is a final judgment and shall be a bar to a second or successive application under this article."). However, the claim

is not otherwise with support, as Petitioner has presented no evidence that Mr. Fortier was ever in possession of the ransom note the family found in the attic. Mr. Fortier testified at trial that the family did not bring the note with them when they arrived at his office to voice their concerns about finding the note. (*See* Trial Tr. Vol. 9, 887-88).[9] This claim shall be dismissed.

## II. Trial Court's Failure to Require State Give Timely Notice of Aggravating Circumstances

Petitioner argues that he was denied his due process rights by the lack of timely notice of the aggravating circumstances the State intended to seek in support of the death penalty. (Pet. Memo 34). Petitioner argues that he filed a motion requesting notice on January 10, 1994, but the trial court ordered that notice be given with the filing of the jury instructions, which were due only twenty-four hours prior to trial. (Pet. Memo 34). Petitioner maintains that as aggravating circumstances are essentially elements of a capital murder charge in a death penalty case, the lack of timely notice requires the Court to grant his requested relief. (Pet. Memo 34). The Mississippi Supreme Court rejected Petitioner's claim on direct appeal. *See Crawford I*, 716 So. 2d at 1041.

The indictment in this case charged Petitioner with an underlying felony of kidnapping. (*See* Trial Tr. Vol. 1, 11-13). The aggravating circumstances upon which the State may rely to support the death penalty are statutorily limited, such that Petitioner was given notice at the time of the indictment as to the aggravating circumstances that could be used against him at trial. *See* Miss. Code Ann. § 99-19-101(5) ("Aggravating circumstances *shall* be limited to the following.") (emphasis added). Additionally, jury instructions were filed by the State on February 9, 1994, one

---

[9] The Court also notes that *Stone v. Powell*, 482 U.S. 465, 494-95 (1986), is a bar to a Fourth Amendment claim that a petitioner has had a full and fair opportunity to litigate, and that bar includes a petitioner's challenge to the legality of his arrest. *See Hughes v. Dretke*, 412 F.3d 582, 596 (5th Cir. 2005).

week after Petitioner complained about the lack of notice of the aggravating factors.  (*See* Trial Tr. Vol. 1).   The Mississippi Supreme Court's rejection of this claim did not involve an unreasonable determination of facts or an unreasonable or contrary application of clearly established law.  *See, e.g., Spinkellink v. Wainwright*, 578 F.2d 582, 609-10 (5th Cir. 1978) ("As for Spenkelink's contention that he had no other notice of the aggravating circumstances on which the State would rely or which the trial would consider, we need only point to [the statute], which defines the aggravating circumstances that may be considered by both judge and jury.").[10]

### III.  Failure to Allow Adequate Voir Dire Regarding Juror Views of Death/Mitigation

Petitioner argues that the trial court erred when it sustained the prosecutor's objections to defense counsel's voir dire into juror opinions regarding automatic death sentences and the weight of mitigating evidence.  (Pet. Memo 35).  During the trial court's voir dire, the court informed the jury it needed to know whether any potential juror so favored the death penalty that they would automatically vote to impose it upon finding Petitioner guilty of capital murder, or whether they were so opposed to the death penalty that they could not under any circumstances vote to impose it upon a finding of guilt.  (*See* Trial Tr. Vol. 5, 259-260).  The trial court explained to the venire that it was necessary to explore whether the potential jurors harbored any feelings for or against the death penalty that would prevent them from serving as a fair and impartial juror.  (*Id.* at 260). Following individual voir dire of those individuals expressing "conscientious scruples" against the

---

[10]  The Court notes that Petitioner cites to *Ring v. Arizona*, 536 U.S. 584 (2002) in support of his argument.  *See* Pet. Memo 34.  The Court does not construe Petitioner's argument to include a claim that the aggravating circumstances should have been contained in the indictment.  However, it notes that such a claim would not warrant relief, as *Ring* is inapplicable to this case under the precedent of *Teague v. Lane*, 489 U.S. 288 (1989).  *See Schriro v. Summerlin*, 542 U.S. 348 (2004).

imposition of the death penalty, the trial court specifically asked whether "any of you so strongly favor the death penalty that in the event the Defendant is found guilty of capital murder that you would automatically vote for the death penalty regardless of evidence you might hear or receive in reference to whether or not the death penalty should be imposed. . . ?". (*Id.* at 269). Potential juror number six, Mr. Gill, Jr., stated he would vote for the death penalty "if it's applicable." (*Id.*). The trial court then asked whether Mr. Gill would vote for the death penalty upon a determination of guilt without hearing evidence in mitigation. (*Id.* at 270). Mr. Gill responded that he would, as he felt "very strong." (*Id.*). The trial court explained the purpose of mitigating evidence, and he again asked whether Mr. Gill would refuse to consider that evidence and follow the court's instructions. (*Id.*). Mr. Gill responded that if Petitioner was found guilty, he would vote for the death penalty. (*Id.*). Mrs. Tatum, potential juror number fifteen, responded that she, too, would vote for the death penalty upon a finding of guilt. (*Id.* at 271). The trial court asked whether she would vote for the death penalty in the event Petitioner was found guilty without consideration of evidence that concerned whether the death penalty should be imposed, and she responded affirmatively. (*Id.*). The court asked another clarifying question regarding whether Mrs. Tatum would vote for the death penalty regardless of the mitigating evidence, and Mrs. Tatum responded that she would vote for death. (*Id.*). The trial court then asked whether anyone who had not responded, upon hearing the court's questions and the responses of others, had a "leaning or feeling" that might affect their ability to perform their duties as a juror, and the court received no response. (*Id.* at 272).

During the State's voir dire, District Attorney Little questioned those jurors who answered that they could or would not vote to impose the death penalty regardless of the evidence in

aggravation.  (*Id.* at 290-294).  Mr. Little then explained the sentencing phase of trial and its

purpose, and he inquired of Mr. Gill and Mrs. Tatum whether they understood the question the

trial court posed to them regarding aggravating and mitigating circumstances.  (*Id.* at 295-96).

Mr. Gill was asked whether he could consider mitigating and aggravating circumstances in his

determination, and Mr. Gill stated that if Petitioner was unanimously found guilty, he doubted so

as he was "very strongly for the death penalty."  (*Id.* at 296).  Mrs. Tatum, being posed the same

question, stated that during the second phase she "would have to vote for the death penalty."  (*Id.*

at 296-97).

 While conducting voir dire for the defense, Mr. Pannell inquired whether any potential

jurors felt as though the death penalty should be an automatic sentence upon a finding of guilt for

capital murder, and Mr. Gill and Mrs. Taylor responded affirmatively.  (*See* Trial Tr. Vol. 6, 356-

57).  Mr. Pannell then asked whether there was "anyone else," and he asked whether it would

change anyone's opinion or position if they added the consideration that the murder was

committed during or after a sexual assault.  (*Id.* at 357).  The trial court sustained the prosecutor's

objection to the form of the question and directed defense counsel to rephrase.  (*Id.*).  Mr. Pannell

then explained to the jury mitigating and aggravating circumstances, and the trial court sustained

the prosecutor's objection to defense counsel's use of the word "mercy" in explaining the jury's

option to render a sentence less than death.  (*Id.* at 358).  Mr. Pannell then began to inquire

whether any potential juror would refuse to give weight to mitigating circumstances, and Mr.

Pannell gave examples of what those might be.  (*Id.* at 358-59).  Mr. Pannell inquired whether

jurors would refuse to consider that Petitioner had a family who loved him, or that he had adjusted

well to life in prison.  (*Id.*).  The prosecution objected on the grounds that defense counsel was

running down a list of possible mitigating circumstances, and the trial court sustained the objection. (*Id.* at 359). Defense counsel then asked whether there was anyone who would not follow the law as given in either phase of the trial, and he received no response. (*Id.* at 360). Mr. Gill and Mrs. Tatum were later excused for cause. (*Id.* at 377).

Petitioner maintains that the trial court prohibited him from asking questions reasonably necessary to expose juror prejudice. (Pet. Memo 26). In its consideration of this claim on direct appeal, the Mississippi Supreme Court noted that the trial judge's voir dire in combination with the individual juror examination was sufficient to determine the issue of potential juror prejudice. *Crawford I*, 716 So. 2d at 1042-43. The court also noted that the trial court conducted voir dire regarding evidence in mitigation while inquiring into the automatic sentence issue, and that defense attorney Pannell had already inquired into whether the potential jurors would consider mitigating circumstances. *Id.* at 1043. The court noted that defense counsel was not precluded from inquiring into juror views on mitigating circumstances. *Id.*

As the record demonstrates, the venire was fully questioned about whether they would automatically vote to inflict the death penalty upon a finding of guilt and whether they would give weight to mitigating circumstances. Defense counsel was not precluded from a voir dire adequate to discern juror bias on the issue. Respondents argue, and the Court agrees, that Petitioner had no constitutionally protected right to inquire into specific mitigating circumstances. In *Morgan v. Illinois*, 504 U.S. 719 (1992), the Supreme Court found that "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." 504 U.S. at 729. The Fifth Circuit has stated that "*Morgan* only 'involves the narrow question of whether, in a capital case,

jurors must be asked whether they would automatically impose the death penalty upon conviction of the defendant.'"  *Trevino v. Johnson*, 168 F.3d 173, 182-83 (5th Cir. 1999) (citation omitted). There is no requirement that a court must allow jurors to be questioned about specific mitigating or aggravating factors.  *Id.*  Petitioner is not entitled to relief on this claim under the AEDPA, and this claim shall be dismissed.

### IV.  Prosecutorial Misconduct

Petitioner argues that the prosecutor improperly vouched for the evidence during his closing argument at the guilt phase of trial by assuring the jury that there was more evidence of guilt in this case than in many other cases the District Attorney had tried.  (Pet. Memo 39). Petitioner contends that the prosecutor also made an improper argument during the sentencing phase of trial by making comments intended to characterize "himself as an unpaid volunteer for the State of Mississippi" and otherwise interjected his personal opinion into the closing argument. (Pet. Memo 39).  Petitioner maintains that the argument of the prosecutor was not founded in evidence, and that the argument was manipulative and was derived from the credibility of the district attorney's office itself.  (Pet. Memo 40).

On direct appeal, the Mississippi Supreme Court found this claim procedurally barred for Petitioner's failure to make a contemporaneous objection to the remarks of the prosecutor. *Crawford I*, 716 So. 2d at 1043, 1044.  The decision of the Mississippi Supreme Court rests upon a clearly expressed independent and adequate state law ground, which precludes federal habeas review of Petitioner's claim.  *See, e.g., Coleman*, 501 U.S. at 750; *see also Stokes v. Anderson*, 123 F.3d 858, 860-61 (5th Cir. 1997) (finding Mississippi's contemporaneous objection requirement an independent and adequate procedural bar).  The Court determines Petitioner has

not demonstrated cause and prejudice sufficient to overcome the imposition of the bar.  *See, e.g.,*

*Coleman*, 501 U.S. at 750.[11]

Without vitiating the procedural bar, the Court notes that prosecutorial argument that

vouches for a witness' credibility or offers the prosecutor's personal opinion as to the defendant's

guilt carries the twin dangers of (1) conveying the impression that evidence exists that is known to

the prosecutor that supports the charges against the accused of which the jury is unaware, and (2)

giving the impression that the prosecutor's opinion is sanctioned by the government itself.  *United*

*States v. Young*, 470 U.S. 1, 18-19 (1985).   A reviewing court is not necessarily concerned with

whether the statements were error, but rather, the issue is whether the statements undermined the

fairness of the trial and contributed to a miscarriage of justice.  *See id.* at 12, 16 ("In other words,

the Court must consider the probable effect the prosecutor's response would have on the jury's

ability to judge the evidence fairly.").   The Court asks whether the comments of the prosecutor "so

infected the trial with unfairness as to make the resulting conviction a denial of due process."

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637

(1974)).

A prosecutor's comments are to be assessed "in the context of the entire trial as a whole

including the prosecutor's entire closing argument."  *Rushing v. Butler*, 868 F.2d 800, 807 (5th Cir.

1989) (citation omitted).   During defense attorney Bell's closing argument at sentencing, he told

the jury about a biography of Clarence Darrow he had read as a boy that discussed Darrow's goal

of saving the lives of Leopold and Loeb.  (*See* Trial Tr. Vol. 13, 1360-61).   Defense counsel also

---

[11] The Court notes that the "fundamental miscarriage of justice" exception is not implicated in this case, as Petitioner has not alleged actual innocence.  *See Schlup v. Delo*, 513 U.S. 298, 321 (1995).

told the jury about another book where a man came home and vomited after witnessing a public execution, and he argued against the idea that the death penalty is a deterrent for crime or otherwise morally acceptable. (*Id.* at 1361-66). Defense counsel concluded that the prosecution would ask the jury to be like Petitioner and become killers. (*Id.* at 1366).

In response, the prosecutor gave closing argument that trial lawyers mentioned by defense counsel entered the courtroom with the goal of winning for their client, and that the roles of a prosecutor and a defense attorney differed. (*Id.* at 1373).

> Some of us have loaned a portion of our career or whatever to a service of the State and we are asking that you do what you consider to be justice in this case. Now we have an idea of what we think justice is. We are going to ask you what you think justice is. We come here to advocate for the State, for the law, for victims because we come here to advocate for justice. We are not here to lead you somewhere you don't want to go. But we are here to encourage you along that path if you are having reservations about it at this time. (*See* Trial Tr. Vol. 13, 1373-74).

The prosecution further argued that Petitioner committed a random act of violence against someone he did not know. (*Id.* at 1380). During closing argument at the guilt phase of trial, the prosecutor did reference the amount of evidence against Petitioner as compared to many other cases he had handled. (*See*, *e.g.*, Trial Tr. Vol. 12, 1205). The Court does not find that the complained-of statements were arguments of facts outside of the record or otherwise impermissible. The prosecutor's argument highlighted the evidence that he believed existed that would support the prosecution's case. Regardless of the appropriateness of some of the prosecutor's comments, the Court does not determine that Petitioner's trial was denied due process as a result of the statements. This claim is barred and otherwise without sufficient support to warrant federal habeas relief.

## V. Prosecutorial Misconduct - Sympathy and Evidence in Mitigation

Petitioner argues that the prosecutor improperly argued to the jury that it should not consider sympathy for Petitioner's family in its sentencing deliberations, which Petitioner maintains violates his Eighth Amendment right to have the jury consider all of the evidence proffered as a reason for returning a sentence less than death. (Pet. Memo 47). Respondents contend that this claim is barred and alternatively without merit. (R. Memo 82-88).

On direct appeal, the Mississippi Supreme Court found Petitioner's argument procedurally barred for failure to lodge a contemporaneous objection. *Crawford I*, 716 So. 2d at 1044. Therefore, this claim is bared from habeas review on independent and adequate state law grounds, and Petitioner has failed to demonstrate sufficient cause and prejudice to overcome the bar's imposition. *See, e.g, Coleman*, 501 U.S. at 750. However, the Court alternatively finds that Petitioner would not be entitled to relief in the absence of a procedural bar.

Under the Eighth Amendment, an accused has the right to have a jury consider all evidence proffered by him as a reason for returning a sentence less than death. *See, e.g., Hitchcock v. Dugger*, 481 U.S. 393, 399 (1987); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). However, Petitioner was not prevented from presenting mitigating evidence in this case. Petitioner's jury was instructed as to how to apply mitigating circumstances, and an instruction was also given that the arguments of counsel are not evidence. (*See*, *e.g*., Trial Tr. Vol. 2, 216, Instruction C.01; Trial Tr. Vol. 3, 286, Instruction D-2-A). Moreover, the Fifth Circuit has found that the United States Supreme Court has never required that a capital defendant be allowed to present evidence of the impact the defendant's execution would have on his family. *See Jackson v. Dretke*, 450 F.3d 614, 617-18 (5th Cir. 2006) ("[T]he Supreme Court has never included

friend/family impact testimony among the categories of mitigating evidence that must be admitted."). The prosecutor was arguing that the jury should not consider such evidence, but he did not argue that the jury was precluded from doing so. *See Jones v. Butler*, 864 F.2d 348, 360 (5th Cir. 1988) (finding prosecutor made no improper argument by stating that jury should not refuse to give a deserved sentence based on impact it would have on criminal's family, as it was not improper argument that mercy was an inappropriate mitigating circumstance, but rather, an argument that the jury should not find it a mitigating circumstance in the defendant's case). This claim shall be dismissed.

## VI. Victim Impact Testimony

Petitioner argues that his Eighth and Fourteenth Amendment rights were violated when Kristy Ray's mother was allowed to testify at sentencing to aspects of her daughter's life. (Pet. Memo 51). On direct appeal, the Mississippi Supreme Court characterized the testimony given by Mary Ray as victim impact testimony that could reasonably be considered relevant to the determination of whether the death penalty should be imposed for Kristy Ray's murder. *See Crawford I*, 716 So. 2d at 1046-47. During the sentencing phase of trial, Mary Ray testified about her daughter's early childhood, accomplishments, activities, goals, and the devastating impact Kristy's death had upon the family. (*See* Trial Tr. Vol. 12, 1237-42). In closing argument, the prosecutor argued that Kristy Ray's parents could not be criticized for "wanting justice" and urged the jury to "give [them] some justice." (Trial Tr. Vol. 13, 1355). In these proceedings, Petitioner argues that this testimony and argument was not related to his responsibility or guilt, and that it was therefore improper. (Pet. Memo 52).

The United States Supreme Court has rejected the argument that States should be prohibited from admitting evidence of the harm caused by a defendant's actions in order to avoid the arbitrary imposition of the death penalty, as such information may reasonably be determined necessary for the jury's meaningful assessment of "the defendant's moral culpability and blameworthiness." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). The testimony given by Mrs. Ray was clearly relevant to the harm caused by Petitioner's actions. As part of their case in mitigation, defense counsel presented the testimony of Petitioner's family members that they did not want Petitioner to receive the death penalty. (*See*, *e.g.,* Trial Tr. Vol. 12, 1248-79). The prosecutor's closing argument was an attempt to counter that testimony. (*See* Trial Tr. Vol. 13, 1354-55). The prosecutor's reference to "justice" was encapsulated in the broader argument concerning the proof that had been presented about Petitioner's culpability. The testimony and argument can not be said to have been "so unduly prejudicial that it render[ed] the trial fundamentally unfair." *Payne*, 501 U.S. at 824. Petitioner is not entitled to relief on this claim.

**VII. Improper Prosecutorial Argument Urging Jury to Ignore Mitigating Factor**

Petitioner argues that Assistant District Attorney Robinson misstated the law and exceeded the bounds of fair argument during closing argument at sentencing when he informed the jury that it did not have to consider whether Petitioner's capacity to appreciate the criminality of his conduct and to conform his conduct to the law was impaired at the time of the crime. (Pet. Memo 53-54). Petitioner maintains that District Attorney Little reiterated the argument during his closing statement by arguing that the determination of Petitioner's capacity had already been determined during the guilt phase of trial. (Pet. Memo 56). Petitioner also argues that the district attorney argued facts not in evidence by stating that Petitioner had written a ransom note the week

of the crime, and that he made an improper argument when he asked the jury to put themselves in the victim's place.  (Pet. Memo 57).

During closing argument at the sentencing phase of trial, Assistant District Attorney Robinson, while arguing why the jury should not find the presence of mitigating factors in this case, stated that the jury had "already ruled against [Petitioner]" on whether his capacity to appreciate the criminality of his conduct and conform his conduct to the law was impaired at the time of the crime, as Petitioner had been found sane by the jury during the guilt phase of trial. (*See* Trial Tr. Vol. 13, 1357).  District Attorney Little also gave a closing argument in which he stated that Petitioner's ability to appreciate the criminality of his conduct "was decided when you [the jury] decided that he was competent or . . . knew right from wrong and was sane at the time he committed these crimes."  (*See id*. at 1376-77).

On direct appeal, the Mississippi Supreme Court held Petitioner's claim concerning the prosecutor's capacity argument procedurally barred for Petitioner's failure to contemporaneously object to the comments.  *Crawford I*, 716 So. 2d at 1047.  Petitioner's claim is likewise barred from federal habeas review due to an independent and adequate State law procedural ground absent a demonstration of cause and prejudice.  *See, e.g., Coleman*, 501 U.S. at 750.  On post-conviction review, Petitioner argued that trial counsel performed ineffectively in failing to object to the prosecution's statements.  *See Crawford II*, 867 So. 2d at 218-19.[12]  The Mississippi Supreme Court found that the prosecutor's statements concerning capacity were in rebuttal to the

---

[12] As Respondents note, and the Court agrees, the Mississippi Supreme Court's consideration of this claim in the context of ineffective assistance of counsel is not a decision on the merits of the substantive claim itself.  *See Steward v. Cain*, 259 F.3d 374, 377-79 (5th Cir. 2001).

argument presented by defense counsel, and it noted that "[a]ttempting to disprove a mitigating factor is not the same as instructing the jury not to consider one." *Id.* at 218. The court found that the prosecutor made "a reasonable inference" in concluding that Petitioner wrote the ransom note that was received into evidence at the conclusion of the testimony of Petitioner's mother. *Id.* The court also noted that the prosecutor did not argue that the jurors place themselves in the victim's shoes, but rather, that "he requested the jury imagine the last moments of the victim's life and what she must have thought." *Id.* at 219.

Assuming, *arguendo*, that the prosecutor's statements were improper, Petitioner has not demonstrated that his trial was not rendered fundamentally unfair by the remarks. The evidence against Petitioner was substantial. *See Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002); *Byrne v. Butler*, 845 F.2d 501, 507 (5th Cir. 1998) (remarks render trial fundamentally unfair where evidence so insubstantial that it is probable that absent the remarks no death sentence would have occurred). Moreover, the jury in this case was instructed to consider as mitigating circumstances (1) "[w]hether the offense was committed while [Petitioner] was under the influence of extreme mental or emotional disturbance;" and (2) "[w]hether the capacity of [Petitioner] to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." (*See* Trial Tr. Vol. 12, 1348; *see also* Trial Tr. Vol. 3, 277, Instruction 2-A). The prosecution's statements did not prevent the jury's consideration of any mental illness or handicap Petitioner might have.

The Court also determines that the prosecutor did not make a "Golden Rule" argument, thereby encouraging the jury to decide the case based on how they would have felt had they been the victim. *See Grossman v. McDonough*, 466 F.3d 1325, 1348 (11th Cir. 2006) (explaining that

such argument asks jurors to place themselves in the victim's position and imagine their pain or otherwise imagine how they would feel if the victim were a relative). The prosecutor's argument was relevant to the especially heinous, atrocious, or cruel aggravator. (*See* Trial Tr. Vol. 13, 1348). The circumstances of Kristy Ray's death were relevant jury considerations, and such an argument is not the same as asking the jurors to place themselves in the victim's position.

Finally, the Court rejects Petitioner's claim that his trial was rendered fundamentally unfair by the prosecutor's references to the ransom note found by Petitioner's family. In closing argument, District Attorney Little stated that Petitioner's mother testified that the ransom note found in the attic of Petitioner's former father-in-law was prepared by Petitioner. (*See, e.g.*, Trial Tr. Vol. 13, 177-78). The prosecutor misstated the evidence, as Petitioner's mother testified that she did not know who prepared the ransom note. (*See* Trial Tr. Vol. 12, 1265). However, the note was found in the home where Petitioner was living, and the note alarmed Petitioner's family members enough that they contacted Petitioner's attorney and the sheriff due to their fear that Petitioner might be planning to harm someone. The inference that Petitioner prepared the note is reasonable given the testimony at trial, and the prosecutor's statement does not amount to a denial of due process. *See Jones v. Butler*, 864 F.2d 348, 356-58 (5th Cir. 1988) (prosecutorial misstatement not so egregious as to violate constitutional rights where misstatement result of reasonable inference from testimony). This claim shall be dismissed.

### VIII. "Especially Heinous, Atrocious, or Cruel" Jury Instruction

Petitioner argues that the "especially heinous, atrocious, or cruel" instruction given to the jury during the sentencing phase of his trial was overbroad and unsupported by sufficient evidence. (Pet. Memo 59). The instruction as read to the jury is as follows:

The court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to or even enjoyment of the suffering of others. An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of murders - - the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture or aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance.

(*See* Trial Tr. Vol. 3, 280).

Petitioner maintains that this instruction fails to offer the jury any guidance in determining how much more proof was needed to find the crime "especially" heinous, such that it failed to adequately guide the sentencer as how to distinguish those murders warranting a sentence of death from other murders. (Pet. Memo 60-62). Petitioner also maintains that the instruction uses two separate definitions of what constitutes an especially heinous, atrocious, or cruel act, and that it otherwise contains dependent clauses that might cause the reader to believe that any individual factor could be used to establish the presence of the aggravator. (Pet. Memo 63). The totality of the infirmities in the instruction, Petitioner argues, is a violation of Eighth Amendment principles that require discretion in sentencing and consistency in results when the limiting instruction is applied. (Pet. Memo 63-65).

Second, Petitioner argues that even if there is no infirmity in the definitions used in the instruction, the evidence in this case was insufficient to prove the existence of the aggravator beyond a reasonable doubt. (Pet. Memo 65). Petitioner notes that trial testimony established that Kristy Ray died rapidly as the result of a single stab wound to the chest, and that there was no

43

evidence that she was mutilated, dismembered, or that she was tortured before death. (Pet. Memo 65).

The Mississippi Supreme Court considered whether the complained of aggravating circumstance was unconstitutionally overbroad as given to the jury. *See Crawford I*, 716 So. 2d at 1047. The court found that it had "repeatedly held that this exact narrowing instruction . . . satisfies constitutional requirements." *Id.* Indeed, the Court notes that the Mississippi Supreme Court has approved language substantially similar to that used in Petitioner's case. *See, e.g., Knox v. State*, 805 So. 2d 527, 533 (Miss. 2002); *Stevens v. State*, 806 So. 2d 1031, 1060 (Miss. 2001); *Lester v. State*, 692 So. 2d 755, 595-98 (Miss. 1997). The language in the instruction clearly comports with the prior findings of the Mississippi Supreme Court regarding the especially heinous, atrocious, or cruel aggravating factor.

An aggravating factor may be overbroad if the jury could "fairly . . . conclude that [the] aggravating circumstances applies to *every* defendant eligible for the death penalty." *Arave v. Creech*, 507 U.S. 463, 474 (1993). An aggravating factor must serve the purpose of adequately informing the jury of what it must find in order to impose the death penalty. *See Maynard v. Cartwright*, 486 U.S. 356, 361-62 (1988). In *Maynard v. Cartwright*, the United States Supreme Court found that Oklahoma's heinous, atrocious, or cruel aggravating factor was not properly limited simply by inserting the word "especially" in the instruction, and it found that a limiting instruction that referred to physical torture or serious injury could cure the infirmity in the instruction. *Maynard*, 486 U.S. at 363-65. The Court noted that torture and abuse were not "the only limiting instruction of the heinous, atrocious, or cruel aggravating circumstance that would be constitutionally acceptable." *Id*. at 365. Additionally, the United States Supreme Court has

44

rejected a vagueness challenge to the narrowing construction of an heinous, atrocious, or cruel aggravator that applies to "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *See Bell v. Cone*, 543 U.S. 447, 457-58 (2005); *see also Proffitt v. Florida*, 428 U.S. 242, 255 (1976). As the jury in this case was instructed as to how to distinguish whether this crime was deserving of the death penalty as compared to other capital murders in the language approved by the Supreme Court, the Court does not find relief warranted under the AEDPA based on the Mississippi Supreme Court's resolution of this claim.

The Court next considers Petitioner's claim that the evidence in his case was insufficient to support a finding of the aggravator beyond a reasonable doubt. In considering whether the aggravator was properly submitted and found by the jury, the issue is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found" the aggravating circumstance beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Bernard*, 299 F.3d 467, 481 (5th Cir. 2002) (applying *Jackson* standard to jury findings regarding aggravating factors). On direct appeal, the Mississippi Supreme Court noted that while testimony was presented at trial that Kristy Ray died within minutes of being stabbed, the evidence also demonstrated that she was raped, anally penetrated, gagged, handcuffed to a tree in the woods, and left alone to bleed to death. *See Crawford I*, 716 So. 2d at 1048. Kristy Ray was kidnaped from her home and held overnight in a barn with Petitioner before suffering the above-described death. The mental torture Kristy endured prior to her death is a relevant jury consideration in determining whether the facts of the case make it especially heinous, atrocious, or cruel. *See Evans v. State*, 422 So. 2d 737, 743 (Miss. 1982). As Respondents note, and this Court agrees, the fact that Kristy Ray died quickly after the fatal

wound was inflicted does not preclude a determination that this aggravator could be found by a rational jury. *See Underwood v. State*, 708 So. 2d 18, 40 (Miss. 1998) (length of time victim alive and conscious following attack not dispositive to the especially heinous, atrocious, or cruel aggravating factor where victim kidnapped from own home and made to walk "to her impending doom" while pondering "how, when, why and in what manner she would be executed."). It can not be said that no rational juror could have found the existence of the aggravator on the facts presented to them, and Petitioner is not entitled to relief on this claim.

## IX. Sentencing Instruction 2-A

A. Consideration of Mitigating Evidence

Petitioner argues that jury instruction 2-A precluded the jury's full consideration of the mitigating circumstances offered at trial, as the jury was instructed eight times that it must make unanimous findings and unanimously agree, thereby creating a reasonable likelihood that the jury believed it had to be unanimous in finding the presence of mitigating circumstances before giving them weight. (Pet. Memo 66-68).

Sentencing Instruction 2-A comprises five pages of the State court papers. (*See* Trial Tr. Vol. 3, 275-279). The jury was charged by the instruction to determine whether Petitioner would be sentenced to death or to life imprisonment, and it instructed the jury as to how the decision must be reached. Petitioner notes that the jury instructions in this case speak to the jury as a whole by the use of the word "you." (Pet. Memo 71). Petitioner argues that as the second-person plural and the second-person singular are both represented in the English language by the word "you," the random jumping from the plural person to the singular person in the instruction made it impossible for the jury to determine that the instruction did not require all twelve jurors to find the

presence of a mitigating factor(s) before each individual member could consider the factor(s). (Pet. Memo 74-75). Petitioner notes that "you" is used twenty-two times in this one instruction alone. (Pet. Memo 75). Petitioner maintains that it is unreasonable to assume that the jury knew when the instruction called group consideration of the evidence and when it called for individual consideration of the evidence. (Pet. Memo 76). Petitioner maintains that even if the instructions did not state that unanimity was required in finding the presence of mitigating factors, the instruction creates a reasonable likelihood that the jury might believe it had to be unanimous. (Pet. Memo 77).

On direct appeal, the Mississippi Supreme Court considered whether it was reasonably likely that Sentencing Instruction 2-A might lead the jury to believe that it had to unanimously find the presence of a mitigating factor before that factor could be considered in sentencing. *See Crawford I*, 716 So. 2d at 1048. The court noted that it had previously addressed the issue and determined that "[w]here the instruction does not use the words 'unanimously' nor 'unanimous' in the mitigating circumstances portion of the jury instructions 'but instead is found only in the aggravating circumstances portion,'" the holding of *Mills* was not offended. *Id.* (referencing *Mills v. Maryland*, 486 U.S. 367, 384 (1988)). The court found that Petitioner's claim paralleled the previously rejected arguments and denied relief on the assignment of error. *Id.*

A jury instruction that creates "a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence" is impermissible under the Eighth Amendment. *Boyde v. California*, 494 U.S. 370, 380 (1990). The United States Constitution requires that a jury in a capital case be allowed to

consider, "as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Therefore, a sentencing instruction which creates a substantial likelihood that a juror might believe they are precluded from considering any mitigating evidence unless all jurors agree on the existence of a particular mitigating circumstance is invalid. *See Mills v. Maryland*, 486 U.S. 367, 384 (1988).

Jury instructions are considered as a whole and not in isolation. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Jury instructions are not parsed apart, but they are instead evaluated with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Drinkard v. Johnson*, 97 F.3d 751, 757 (5th Cir. 1996) (quoting *Johnson v. Texas*, 509 U.S. 350, 368 (1993)). In this case, the jury was instructed it must agree on the *verdict*. (*See* Trial Tr. Vol. 3, 273, Instruction C.11). The jury was also instructed that the death sentence could be rejected even if no mitigating circumstances were found, and that a life sentence could be returned regardless of the aggravating or mitigating circumstances found. (*See* Trial Tr. Vol. 13, 1352-53). The jury was also instructed it must make a unanimous verdict if a verdict could be reached "without violence to your individual judgment." (Trial Tr. Vol. 13, 1353). Additionally, the Mississippi Supreme Court has repeatedly determined that the word "unanimous" in this instruction is not used to modify mitigation in any instance. *See, e.g.*, *Edwards v. State*, 737 So. 2d 275, 313 (Miss. 1999); *Berry v. State*, 703 So. 2d 269, 288-89 (Miss. 1997); *Williams v. State*, 684 So. 2d 1179, 1200-01 (Miss. 1996); *Ladner v. State*, 584 So. 2d 743, 760-61 (Miss. 1991)). In the instant instruction, the word "unanimous" is used only in regard to aggravating circumstances. This claim shall be dismissed.

B.  Instruction shifted burden of proof to Petitioner

Petitioner argues that pursuant United States Supreme Court precedent, a jury must make findings of aggravating circumstances beyond a reasonable doubt, and that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt.  (Pet. Memo 78-82, citing *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt)).  Petitioner argues that the instructions in his case basically instructed the jury that death was an appropriate sentence unless mitigating circumstances were found to outweigh the already established aggravating circumstances, as it was established at the guilt phase of trial that the crime occurred during the course of a kidnapping.  (Pet. Memo 84).

Petitioner's jury was instructed to consider three aggravating factors in determining the appropriate sentence.  The first aggravating circumstance was whether Petitioner was previously convicted of a felony involving the threat or use of violence.  (*See* Trial Tr. Vol. 3, 276).  The second was whether the offense was committed during the commission of a kidnapping.  (*Id*.).  The final aggravating circumstance was whether the offense was especially heinous, atrocious, or cruel.  (*Id*.).  Upon finding the presence of at least one aggravating factor, Petitioner's jury was instructed to deliberate as to whether mitigating circumstances existed that outweighed the aggravating circumstance(s).  (*See*, *e.g*, Trial Tr. Vol. 3, 277, 278, 279, Instruction 2-A).  On direct appeal, the court noted that the instruction at issue clearly stated the law as pronounced in Miss. Code Ann. § 99-19-101(2) & (3).  *See Crawford I*, 716 So. 2d at 1049.  The court noted that the statute requires that the jury find that the mitigating circumstances outweigh the statutorily

49

limited aggravating circumstances, and the court noted its case law has rejected the contention that defendant bears the burden of proof by statute's language. *Id.*

The jury in this case was instructed that the State bore the burden of proving the existence of aggravating circumstances in an instruction that tracks the language of Miss. Code Ann. § 99-19-101(2)(c) & 3(c). Petitioner's jury was instructed that it must find Petitioner culpable beyond a reasonable doubt to consider the death penalty. (*See* Trial Tr. Vol. 3, 275-76). Then, the jury was instructed it must find the presence of at least one enumerated aggravating circumstance beyond a reasonable doubt in order to have the option of imposing the death penalty. (*See* Trial Tr. Vol. 3, 276). The especially heinous, atrocious, or cruel instruction required the jury to find the presence of the aggravator beyond a reasonable doubt. (*See* Trial Tr. Vol. 3, 280, Instruction No. 3). A separate instruction informed the jury that the State bore the burden of proving beyond a reasonable doubt the existence of any aggravating circumstance. (*See* Trial Tr. Vol. 3, 282, Instruction No. 5). The kidnapping instruction required the State to have proved the aggravator beyond a reasonable doubt. (*See* Trial Tr. Vol. 3, 283, Instruction No. 6). At no point did Petitioner bear the burden of proof. Additionally, the Fifth Circuit has rejected the view that *Apprendi* and *Ring* require the government to prove the absence of mitigating circumstances beyond a reasonable doubt. *See Granados v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005). Finally, the Court notes that a statutory scheme that did require Petitioner to prove the existence of mitigating circumstances that outweighed the aggravating circumstances to warrant a sentence of life would not offend the Constitution. *See Walton v. Arizona*, 497 U.S. 639, 650 (1990) ("So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the

offense charged, or in this case, to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency."); *see also Kansas v. Marsh*, 548 U.S. 163, (2006) ("At bottom, in *Walton*, the Court held that a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances."). This claim shall be dismissed.

### X. Use of Element of Capital Murder as Aggravating Circumstance

Petitioner was found guilty of kidnapping at the close of the guilt phase of trial, and he argues that the additional use of kidnapping as an aggravating circumstance violates the Eighth Amendment, inasmuch as it fails to narrow the class of death-eligible defendants in a constitutional manner. (Pet. Memo 87-90). Petitioner acknowledges that the Mississippi Legislature has determined that the death penalty is an appropriate punishment for certain classes of homicide, and that narrowing is accomplished by the requirement that the jury find the presence of at least one aggravating circumstance before a death sentence may be imposed. (Pet. Memo 90). Petitioner argues, however, that the "double-count" of the kidnapping aggravator is error in a weighing state like Mississippi, as it "creates the possibility of randomness by placing a thumb on death's side of the scale, thus creating the risk of treating the defendant as more deserving of the death penalty." (Pet. Memo 91-92, citing *Sochor v. Florida*, 504 U.S. 527, 532 (1992)).

On direct appeal, the Mississippi Supreme Court noted that Petitioner was indicted under Miss. Code Ann. § 97-3-19(2)(e) for capital murder committed during the commission of a kidnapping. *See Crawford I*, 716 So. 2d at 1049. The jury was instructed to consider three aggravating circumstances in its sentencing deliberations, one of which was that the murder was

committed during the course of a kidnapping. *Id.* The court noted that in *Arave v. Creech*, 507 U.S. 463, 474 (1993), the United States Supreme Court held that an aggravating circumstance that applies to every death-eligible defendant fails to narrow the class of persons eligible for the death penalty and is constitutionally infirm. *Id.* at 1049-50. The court noted that under Mississippi's sentencing scheme, an accused becomes subject to a jury finding of death once he is found guilty of capital murder, but that the jury may find he should not suffer death regardless of whether he puts on mitigating circumstances. *Id.* at 1050. Determining that its prior holdings were in keeping with established Supreme Court precedent, the court found the assignment of error without merit. *Id.*

The United States Supreme Court has held that a capital punishment scheme may properly narrow the class of death-eligible defendants by legislative function or by requiring that the jury find the presence of an aggravating circumstance. *See Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988). In *Tuilapea v. California*, 512 U.S. 967, 972 (1994), the United States Supreme Court held that "[t]he aggravating circumstances may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *See also Williams v. Taylor*, 529 U.S. 362, 393 n.16 (2000) (no prohibition in using underlying felony as aggravating circumstance); *Evans v. Thigpen*, 809 F.2d 239, 241 (5th Cir. 1987) (no constitutional right violated by use of aggravating factor duplicates element of underlying felony). Petitioner has not demonstrated that the decision of the Mississippi Supreme Court warrants relief under the AEDPA, and this claim shall be dismissed.

## XI. Disproportionate Penalty

Petitioner argues that his documented history of personal and familial mental problems reduce his moral culpability in this crime, such that a sentence of death in his case is excessive

and disproportionate to the penalty imposed in other capital cases. (Pet. Memo 97-98). Petitioner has attached exhibits to his federal habeas petition in support of his claim that he is mentally ill, and thus, lacks the moral culpability the Eighth Amendment requires to impose a sentence of death upon him. (*See* Pet. Memo, Ex. G and Ex. H). Petitioner cites at length to the exhibits and record evidence in this case suggesting that he suffers from a mental illness. For example, his family members testified at trial that they knew Petitioner suffered from some sort of mental problem from Petitioner's youth. (*See*, *e.g.*, testimony of John Lee Montgomery, Trial Tr. Vol. 9, 893; testimony of Marion Ray Crawford, Trial Tr. Vol.10, 924-954; testimony of Chloise Ray Crawford, Trial Tr. Vol. 10, 957-972; testimony of Rebecca Crawford, Trial Tr. Vol. 10, 977-997). There was testimony that Petitioner was first taken to a psychiatrist and placed on medication for mental illness when he was approximately twelve years old. (*See*, *e.g.*, Trial Tr. Vol. 10, 926). There was testimony that Petitioner's behavior grew increasingly erratic as Petitioner got older, and that his "episodes" of depression or rage occurred about once every three months. (*See*, *e.g*., Trial Tr. Vol. 10, 930, 932-33, 960, 979). There was trial testimony that Petitioner was placed in a State hospital at the age of twenty-two by his parents, and his parents later sought help from another doctor in Memphis. (*See*, *e.g,* Trial Tr. Vol. 10, 936-940). Dr. Stanley Russell testified at trial that Petitioner suffers from psychogenic amnesia. (*See* Trial Tr. Vol. 9, 825-26). Dr. Martin Webb testified that he had diagnosed Petitioner as suffering from Bipolar Disorder with occasional psychotic episodes, which he characterized as a severe mental illness. (*See* Trial Tr. Vol. 12, 1284, 1288). .

On direct appeal, the Mississippi Supreme Court conducted a statutorily mandated review to determine "whether the sentence of death is excessive or disproportionate to the penalty

imposed in similar cases, considering both the crime and the defendant." *Crawford I*, 716 So. 2d

at 1051; *see also* Miss. Code Ann. § 99-19-105. Petitioner argued to the court that his severe

mental illness raised the possibility that his execution would violate the prohibition against cruel

and unusual punishment. *Id.* The Mississippi Supreme Court considered Petitioner's claim,

apparently, as one of mental retardation. *See id.* The court noted that the Eighth Amendment did

not categorically bar the execution of mentally retarded persons, nor did Mississippi law. *See id.*[13]

Rather, the court noted, a death sentence may be upheld if the jury was allowed to consider and

give effect to Petitioner's mental retardation as mitigating evidence. *Id.* Included in Mississippi's

list of statutory mitigating circumstances is whether "[t]he offense was committed while the

defendant was under the influence of extreme mental or emotional disturbance," and whether

"[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his

conduct to the requirements of the law was substantially impaired." *Id.* The court determined that

the jury in Petitioner's case was instructed to consider these mitigating circumstances and also

heard "extensive argument" from Petitioner's counsel regarding his mental illness. *Id.* at 1051-52.

 The court recounted the expert psychiatric and psychological opinions offered in the case and

determined that "[t]he 'battle of the experts' boils down to whether Crawford's emotional state at

the time of the crime would preclude the imposition of the death penalty." *Id.* at 1052. The court

noted that Petitioner's behavior was not indicative of one who suffered a "mental snap," as he

concealed Kristy Ray's body and attempted to avoid detection by law enforcement officials once

---

[13] The execution of mentally retarded offenders is now categorically barred under the
precedent of *Atkins v. Virginia*, 536 U.S. 304 (2002). The Court notes that even if this claim
were considered in light of *Atkins*, it would not provide Petitioner with relief. *See In re Neville*,
440 F.3d 220, 221 (5th Cir. 2006)(*Atkins* did not exempt mentally ill inmates from execution).

he neared his home. The court found that Petitioner's sentence was not disproportionate. The court also considered the issue of proportionality during Petitioner's post-conviction proceedings in the context of aggregate error, and it determined Petitioner's assignments of error were without merit. *See Crawford II*, 867 So. 2d at 207.

The question for the Court is not whether Petitioner's sentence is disproportionate to his crime, but whether the conclusion that it was not is contrary to clearly established federal law. The cases relied upon by Petitioner do not hold that the execution of a person committing capital murder while suffering from mental illness is barred by the Eighth Amendment. There is no clearly established federal law cited by Petitioner so holding. Moreover, a proportionality review of Petitioner's sentence is not constitutionally required. *See Murray v. Giarrantano*, 492 U.S. 1, 9 (1989) (noting previously declined to hold Eighth Amendment requires appellate courts to perform proportionality review of death sentences); *McCleskey v. Kemp*, 481 U.S. 279, 306-08 (1987); *Pulley v. Harris*, 465 U.S. 37, 41, 43-44 (1984).

A state system of capital punishment that channels the jury's discretion by allowing consideration of particularized characteristics of both the defendant and the offense presumes no constitutional violation in the sentence's imposition. *See McCleskey*, 481 U.S. at 308. This Court is not required to "look behind" a state court's finding of proportionality to avoid the arbitrary or capricious imposition of a death sentence when the state procedure sufficiently guides the sentencer. *See Walton v. Arizona*, 497 U.S. 639, 655-56(1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 589 (2002). Petitioner has not presented this Court with evidence that the Mississippi Supreme Court rejected this claim in a departure from precedent in its review such that its rejection of this claim could be considered a denial of due process. *See Pulley*, 465

U.S. at 41-42; *Donnelly*, 416 U.S. at 642 (absent specific constitutional violation, federal habeas review limited to consideration of whether error "so infected the trial with unfairness as to make the resulting conviction a denial of due process").  This claim shall be dismissed.

## XII.  Cumulative Error

Petitioner maintains that the United States Supreme Court has increasingly looked to the totality of the circumstances in habeas cases to determine if relief is warranted, and that his case is one in which the cumulation of trial errors denied him of due process.  (Pet. Memo 100-01).  On direct review, the Mississippi Supreme Court found no errors to cumulate, as none of the claims of error alleged by Petitioner rose to the level of reversible error.  *See Crawford I*, 716 So. 2d at 1052.  On post-conviction review, the court considered Petitioner's claims of ineffective assistance of counsel and noted that it would not address alleged error of counsel under an aggregate standard.  *See Crawford II*, 867 So. 2d at 207.  Rather, the post-conviction court addressed Petitioner's claims under the standard applicable to claims of ineffective assistance of counsel and found no error.  *Id.*

The Fifth Circuit has held that:

[F]ederal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than a mere violation of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973)

*Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992)(en banc).  In assessing whether errors violated a petitioner's right to fundamental fairness, courts "review the record as a whole to determine whether the errors more likely than not caused a suspect verdict."  *Spence v. Johnson*, 80 F.3d 989, 1001 (5th Cir. 1996).  Petitioner's assignments of error do not cast doubt on the jury's

verdict, and errors that are not prejudicial cannot be cumulated. *See Derden*, 978 F.2d at 1461.

Therefore, this claim shall be dismissed.

### XIII.  Denial of F.B.I Report Containing Exculpatory and Impeachment Evidence

At trial, Petitioner maintained that he did not lead law enforcement officials to Kristy Ray's

body, but that *he* was led to the body by law enforcement officials after the body was located using

a specialized, infrared-equipped aircraft.  (Pet. Memo 103).  Petitioner maintains that his allegation

is substantiated by an F.B.I. report which clarifies that the aircraft was "extremely beneficial in

guiding the search team to the victim's body."  (Pet. Memo, Ex. J, F.B.I. report).   Petitioner

contends that the report was created in February of 1993, and it was not turned over to the defense

until the trial was over, despite the fact that defense counsel had specifically requested such

documents in discovery as early as January of 1994.  (Pet. Memo 104 and Ex. J, Motion for

Discovery; Ex. I, Aff. of David Bell).  Petitioner argues he was denied his constitutional rights by

the government's failure to disclose the F.B.I. report, as the testimony of Agent Jackson

downplayed the importance of the aircraft in locating Kristy Ray's body.  (Pet. Memo 103).

Petitioner maintains that not only did the State allow Agent Jackson to give misleading testimony

about how Kristy Ray's body was discovered, the State's failure to turn over the report deprived

Petitioner of valuable impeachment evidence.  (Pet. Memo 105-06, 108-110).  Petitioner maintains

that the nondisclosure of the report was crucial, as it would have verified Petitioner's story and

directly challenged a key State witness, who testified that Kristy Ray's body would not have been

found so quickly without Petitioner's assistance. (Pet. Memo 112-114).  Petitioner raised this claim

in his petition for post-conviction relief.  The Mississippi Supreme Court found no contradiction in

Agent Jackson's testimony and the F.B.I. report, and it determined the report did not constitute material evidence. *See Crawford II*, 867 So. 2d at 203-04.

The State is required to disclose to the defense requested evidence that is (1) favorable to the accused and (2) material to either guilt or punishment. *See United States v. Bagley*, 473 U.S. 667, 674 (1985); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Material" evidence is that which, if it had been disclosed, allows the existence of a reasonable probability that the results of the proceedings would have been different. *See Bagley*, 473 U.S. at 682. Impeachment evidence is the equivalent to exculpatory evidence and falls within the *Brady* rule. *Bagley*, 473 U.S. at 676. Where a State actor knows that a witness has given false testimony and a conviction is obtained, regardless of whether it is solicited, the defendant is denied due process. *See Napue v. People of State of Illinois*, 360 U.S. 264, 269 (1959).

The F.B.I. report at issue was obtained through a Freedom of Information Act request. (*See* Pet. Memo, Ex. J). There are words in the report that have been blackened-out as "sensitive" material, and handwritten, internal F.B.I. codes are used in their place. Petitioner demonstrates that one repeating code most likely refers to the infrared-equipped aircraft that was used in the search for Kristy Ray's body. The report indicates the usefulness of the aircraft in finding Kristy Ray's body, and Agent Jackson testified at trial that specialized aircraft assistance was utilized in the search. (*See* Pet. Memo, Ex. J, and Trial Tr. Vol. 7, 484, 490). Agent Jackson also testified at trial, however, that Kristy Ray's body would not have been found as quickly as it was without Petitioner's assistance, in spite of the use of the specialized aircraft. (*See* Trial Tr. Vol. 7, 486). During post-conviction proceedings, Agent Jackson submitted an affidavit attesting that the aircraft

was used to help Petitioner locate a creek so that he would have a landmark by which he could then lead searchers to the body.  (*See* R. Memo, Ex. B).

Agent Jackson's trial testimony is not in conflict with the F.B.I. report, and the report contains no exculpatory or impeachment evidence.  Petitioner has not demonstrated that a reasonable probability exists that the result of his proceedings would have been different had the report been disclosed, and he has not demonstrated that the decision of the Mississippi Supreme Court warrants relief under the AEDPA.  This claim shall be dismissed.

## XIV.  Ineffective Assistance of Counsel at Guilt Phase[14]

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel.  *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  A federal habeas petitioner's claim that he was denied the effective assistance of counsel at trial is measured by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail on a claim of ineffective assistance of counsel, Petitioner must establish that (1) his trial counsel's performance was so deficient that it cannot be said that he was functioning as "counsel" within the meaning of the Sixth Amendment, and (2) the deficient performance prejudiced his defense.  *See id.* at 687; *see also Boyle v. Johnson*, 93 F.3d 180, 187 (5th Cir. 1996) (ineffective assistance of counsel claims analyzed under *Strickland* framework).

---

[14]  Petitioner cites American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (hereinafter "ABA Guidelines") 11.2. (February 1989 ed.) (Pet. Memo 117).  The Supreme Court has cited the ABA Guidelines as the prevailing norms of practice to determine what is reasonable. (Pet. Memo 117-118) (*see also Williams*, 529 U.S. 362, 396 (2000); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Rompilla v. Beard*, 125 S.Ct. 2456, 2465 (2005).

Where an attorney's representation falls below an objective standard of reasonableness as determined by professional norms, that performance is deficient. *See Rompilla v. Beard*, 545 U.S. 374, 380 (2005); *Strickland*, 466 U.S. at 687-89. Courts scrutinizing counsel's performance assume a "strong presumption" that the assistance was adequate and "that the challenged conduct was the product of reasoned trial strategy." *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996) (citation omitted). This presumption may be overcome if a petitioner can identify acts or omissions of counsel that were not the result of a reasoned, professional judgment. *See Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, even unreasonable errors by counsel do not warrant relief if the error did not effect the judgment. *See Strickland*, 466 U.S. at 691. Rather, actual prejudice results from the errors of counsel when there exists a reasonable probability that, but for the error, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* The failure to prove either deficient performance by counsel or actual prejudice as a result of counsel's actions or omissions defeats a claim of ineffective assistance. *See Strickland*, 466 U.S. at 397; *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998); *Smith v. Puckett*, 907 F.2d 581, 584 (5th Cir. 1990). As claims of ineffective assistance of counsel involve mixed questions of law and fact, claims previously considered and rejected by the State court may be overturned only if "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See Strickland*, 466 U.S. at 698; 28 U.S.C. § 2254(d)(1).

Counsel's failure to preserve a claim in State court can in some circumstances constitute cause sufficient to overcome a procedural default. *See Coleman*, 501 U.S. at 753-54. However, a petitioner claiming ineffective assistance of counsel for the purpose of having the underlying

substantive claim reviewed on its merits must ordinarily have presented the ineffective assistance of counsel claim independently in State court before it may be argued as cause to excuse a procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451(2000).

A. Failure to Develop a Meaningful Attorney/Client Relationship

Petitioner maintains that he and trial counsel harbored dislike for one another and were unable to effectively work together. (Pet. Memo 118-19). Petitioner notes that he filed a bar complaint against defense counsel, James Pannell, to which Mr. Pannell responded that Petitioner was a "sick, twisted individual." (Pet. Memo 120, Ex. O). Petitioner notes that during trial, he informed the trial court that Mr. Pannell did not like representing Petitioner, and Petitioner has attached to his memorandum an affidavit from his father, who attests that he witnessed Mr. Pannell stating such to Petitioner. (Pet. Memo 120 and Ex. P). Petitioner maintains that defense counsel refused to answer his letters and return his telephone calls, and that he objected throughout trial to counsel's failure to communicate with him or otherwise allow him to assist in his own defense. (Pet. Memo 120). Petitioner argues that as a result of the mutual dislike and lack of trust, Mr. Pannell was not able to effectively represent him. (Pet. Memo 121).

On post-conviction review, the Mississippi Supreme Court determined that Petitioner had failed to cite any authority for his argument, other than a case where defense counsel was found to have exhibited behavior like a "second prosecutor." *Crawford II*, 867 So. 2d at 207 (citing *Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997)). The court found that Petitioner had not made similar allegations against his defense counsel and determined counsel had not been shown to have performed deficiently in his representation of Petitioner. *Id.*

Petitioner has attached to his federal habeas petition two letters he wrote defense counsel. (*See* Pet. Memo Ex. Q). The first letter demands that counsel file various motions, such as a motion to dismiss, a challenge to the indictment, and a recusal motion. (*Id.*). The second letter, dated March 1, 1994, expresses Petitioner's displeasure with counsel's failure to secure favorable rulings on the motions to recuse, as well as other complaints. (*Id.*). The trial record also demonstrates several instances where Petitioner asked to address the court to complain of the representation he was receiving at trial. (*See, e.g.*, Trial Tr. Vol. 6, 408-09; 503-05; Trial Tr. Vol. 8, 669-73; Trial Tr. Vol. 9, 818-821; 880-81). There is no doubt that Petitioner was unhappy with the representation he received. However, Petitioner had no right to a "meaningful relationship" with trial counsel. *See Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) ("[W]e reject the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel."; *see also McCrae v. Blackburn*, 793 F.2d 684, 688 (5th Cir. 1986) (lack of communication between counsel and appellant did not constitute ineffective assistance absent showing that lack of communication resulted in prejudice to appellant); *United States v. Keys*, 67 F.3d 801 (9th Cir. 1995) ("A defendant's right to the effective assistance of counsel does not entitle him to a friend."); *Jones v. Walker*, 496 F.3d 216 (11th Cir. 2007) (there is no right to a meaningful relationship under Sixth Amendment). The fact that Petitioner did not like the way counsel was conducting his defense is not in and of itself a constitutional violation. *See Moreno v. Estelle*, 717 F.2d 171, 175 (5th Cir. 1983). Petitioner has not demonstrated that trial counsel performed deficiently or that he was prejudiced as a result of any dislike he and defense counsel may have harbored for one another. Therefore, he has not demonstrated that the Mississippi Supreme Court's resolution of this claim warrants federal habeas relief. This claim shall be dismissed.

B.  Failure to Secure Adequate Investigatory Funds

Petitioner argues that due to trial counsel's failure to ensure that the defense had adequate resources to investigate the crime, the F.B.I. report, which contained valuable impeachment evidence, went undiscovered.  (Pet. Memo 121-22).  The Mississippi Supreme Court determined Petitioner "fail[ed] to create a nexus between lack of funds and discovery of [the F.B.I.] report, as he was able to find it through the Freedom of Information Act on his own."  *See Crawford II*, 867 So. 2d at 208.  There is no indication that trial counsel's failure to secure investigatory funds caused defense counsel to fail to obtain the F.B.I. report.  Moreover, the Court has rejected Petitioner's claim of error regarding the suppression of the report.  The Court finds that the decision of the Mississippi Supreme Court with regard to this issue does not warrant relief under the AEDPA, and this claim shall be dismissed.

C.  Failure to Secure Adequate Funds for Experts

Petitioner maintains that defense counsel performed ineffectively in failing to secure the funds necessary to hire experts needed to present an effective insanity defense, as counsel failed to pursue the ex parte motion for funds for a psychiatric expert that was filed on April 11, 1994.  (Pet. Memo 123-24).  In considering this claim on post-conviction review, the Mississippi Supreme Court found that Petitioner had the assistance of experts at trial, and it noted that Petitioner failed to present the court with an affidavit from any expert stating what testimony would have been provided had Petitioner been able to afford his or her services.  *Crawford II*, 867 So. 2d at 208. The court found Petitioner had failed to demonstrate that trial counsel's performance fell below "any kind of standard," and it denied relief.  *Id.*  The record supports that conclusion.  At trial, Petitioner received the expert assistance of both Dr. Webb and Dr. Russell, who were the experts

that trial counsel requested the trial court allow Petitioner to retain.  (*See* Trial Tr. Vol. 5, 152-54).

Petitioner has failed to demonstrate that the Mississippi Supreme Court's resolution of this claim

warrants relief under the AEDPA, and it shall be dismissed.

D.  Failure to Investigate Critical Aspects of the Defense

Petitioner argues that trial counsel failed to adequately investigate and effectively present

his insanity defense at trial.  (Pet. Memo 124-25).  Specifically, Petitioner argues trial counsel

rendered ineffective assistance in presenting the testimonies of Dr. Stanley Russell and Dr. Martin

Webb, inasmuch as the defense experts appeared unfamiliar with facts of the case, contradicted one

another's findings, and diagnosed Petitioner with competing conditions.  (Pet. Memo 125).

Dr. Stanley Russell, treating psychiatrist at the Mississippi Department of Corrections,

testified at both the guilt and sentencing phases of trial.  (*See*, *e.g.*, Trial Tr. Vol. 9, 822-881; Trial

Tr. Vol. 12, 1293-98).  Dr. Russell treated Petitioner from June 1993 until the time of Petitioner's

trial, and he testified that Petitioner suffered from depression and psychogenic amnesia.  (*See* Trial

Tr. Vol. 9, 825).  During Dr. Russell's cross-examination, the district attorney asked whether

Petitioner had informed Dr. Russell about particular facts or circumstances surrounding the crime,

in an attempt to demonstrate that Dr. Russell did not have all relevant data prior to making a

diagnosis.  (*See*, *e.g.*,Trial Tr. Vol. 9, 854-865).  Dr. Russell specifically stated that the omitted

information, while relevant to Petitioner's personality disorders, would have had no impact on his

diagnosis.  (*Id*. at 873).  Psychiatrist, Dr. Martin Webb, was retained by the family to evaluate

Petitioner for mental illness approximately one year prior to the events leading up to Petitioner's

trial for the murder of Kristy Ray.  (*See* Trial Tr. Vol. 12, 1281-82).  Dr. Webb testified during

Petitioner's presentation of mitigating evidence.  He opined that Petitioner suffered from "manic

depressive illness," but he stated that he did not dispute Dr. Russell's diagnosis. (*See* Trial Tr. Vol. 12, 1286). Both psychiatrists opined that Petitioner was not criminally responsible for his behavior at the time Kristy Ray was murdered.

The Mississippi Supreme Court rejected Petitioner's argument that he received ineffective assistance through trial counsel's use of two experts with different opinions. *Crawford II*, 867 So. 2d at 208 n.5. The court also rejected that Petitioner's insanity defense was inadequately investigated and presented. *Id.* at 208. Petitioner has not demonstrated that the decision of the Mississippi Supreme Court was unreasonable. As Dr. Russell stated while being cross-examined about the differing diagnoses given by himself and Dr. Webb, psychiatrists often disagree. (*See* Trial Tr. Vol. 12, 1296). Petitioner has come forward with no proof that these experts were unprepared to testify, and the fact that they did not read the police reports has not been shown to have been of consequence. Dr. Russell testified that the information contained within the reports would not have been relevant in diagnosing Petitioner. (*See, e.g.*, Trial Tr. Vol. 8, 873). Dr. Russell's guilt-phase testimony was for the purpose of establishing Petitioner's insanity defense, while the goal in the sentencing phase was to offer evidence in mitigation. The differing opinions as to what mental illness Petitioner suffered occurred during the mitigation phase of trial where the goal was not to establish insanity, but the presence of a mental illness that would mitigate Petitioner's culpability in the crime. Moreover, to the extent the claim could be construed as such, there is no constitutional right to the effective assistance of an expert witness. *See Wilson v. Greene*, 155 F.3d 396 (4th Cir. 1998). This claim shall be dismissed.

E.  Failure to Properly Litigate Competency Issues

Petitioner contends that trial counsel rendered ineffective assistance in failing to request a competency hearing at trial, despite the fact that Petitioner was under the effects of various medications to control his mental illness and seizures.  (Pet. Memo 128-131).  Petitioner maintains that Dr. Lemly Hutt, Jr., a licensed clinical psychologist who examined Petitioner as part of trial preparation on unrelated charges, assessed Petitioner for competency prior to Petitioner's seizure in May 1993.  (Pet. Memo 129).  Petitioner maintains that Dr. Hutt's finding that Petitioner was competent to stand trial was made prior to Petitioner being placed on a prescription of Dilantin, an antiepiletpic/antiseizure medication, which Petitioner maintains left him groggy and frequently incoherent. (Pet. Memo 129).  Dr. Hutt submitted an affidavit opining that Petitioner's grogginess and incoherence was likely the effect of too much Dilantin in his blood stream.  (Pet. Memo 130, Ex. T).  Petitioner maintains that after consulting with defense attorneys, Dr. Hutt opined that Petitioner was incompetent to stand trial until the correct dosage of Dilantin could be determined. (Pet. Memo 129-30, Ex. T).  Dr. Hutt also gave an opinion that Petitioner's seizures could be caused by organic brain damage Petitioner might have sustained when he received a head injury as a teenager.  (Pet. Memo 130 and Ex. T).  Petitioner argues that trial counsel knew of this information and allowed him to remain medicated throughout trial.  (Pet. Memo 130).

On post-conviction review, the Mississippi Supreme Court determined Petitioner failed to demonstrate prejudice resulting from trial counsel's failure to litigate the issues surrounding Petitioner's competency.  *Crawford II*, 867 So. 2d at 208-09.  The court noted that Petitioner had been found competent for trial in an unrelated case eleven months prior to trial of this case, and that no changes in his condition had been documented.  *Id.* at 208.  The court noted that Petitioner

had attached to his petition exhibits in the form of medical records and affidavits documenting medical treatment for his seizure, as well as Dr. Hutt's affidavit. *Id*. at 209-10. The court noted that Dr. Hutt had originally found Petitioner competent to stand trial in the aggravated assault case, and that the affidavit contained second-hand information regarding Petitioner's condition. *Id*. at 209. The court also found that Dr. Hutt did not state Petitioner was incompetent to stand trial, but rather, he stated that there existed a probability that Petitioner was incompetent to stand trial based on the facts as relayed to him by defense counsel. *Id.* Dr. Hutt stated he could not assess Petitioner's competency with certainty until he had the opportunity to examine Petitioner and review test results. *Id.* The court also noted that the issue of Petitioner's competency while medicated was raised in his unrelated trial, and the affidavit from Dr. Hutt was considered along with an affidavit from Dr. Webb. *Id*. at 209 citing *Crawford*, 787 So. 2d at 1242. Each expert there "expressed concern" as to the effect of medication on Petitioner's competency. *Id*. The court noted that in that case, however, Dr. Reb McMichael testified that the levels of Lithium and Dilantin in Petitioner's bloodstream were not sufficient to interfere with his ability to assist in his defense. *Id.* The court noted that these prior affidavits "would have put Crawford and counsel for this petition on notice as to the levels of Dilantin that Crawford may have been on, yet there is no affidavit provided in the petition as to the effects of such a dosage on Crawford." *Id.*

Petitioner also submitted to the post-conviction court an affidavit from his father, which the court noted was the only evidence of Petitioner's alleged incompetency. *Id.* The affidavit stated that Petitioner was at times incoherent during trial and unable to respond to questions due to his medication. *Id.* at 210. Petitioner's father also attested that Petitioner "sat with his head slumped down or his back to the jury" on several occasions. *Id*. The court found that trial counsel was

deficient for failing to request that the trial court note changes in Petitioner since the prior trial and make another ruling on his competency based on the changes.  *Id.*  However, the court found no facts that would demonstrate prejudice, as Petitioner had failed "to show facts which would have changed since the original determination, or to provide an affidavit by a doctor who would have testified to his incompetency, or perhaps to have simply found how much medication Crawford was on at the time and provided a medical opinion as to the effects of such a level of medication." *Id.*

Where a defendant lacks a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and lacks a rational as well as factual understanding of the proceedings against him, he is incompetent to stand trial.  *See Dusky v. United States*, 362 U.S. 402 (1960).  A competency determination must generally be made where information received by the trial court raises, or should raise, a doubt as to the defendant's competency.  *See Drope v. Missouri*, 420 U.S. 162, 180 (1975).  The Court has cited the decision of the Mississippi Supreme Court at length. The Court notes that Dr. Hutt did not examine Petitioner, and everyone, including Petitioner's own expert, Dr. Russell, who saw him several times a week, conceded that Petitioner was competent to stand trial.  (*See* Trial Tr. Vol. 9, 842).  The Court agrees with Respondents' argument that the record is replete with evidence that Petitioner was clearly competent at the time of trial, as evidenced by his comments to the trial court and letters to counsel.  (See R. Memo 154-55).[15]

---

[15]  For example, in Petitioner's March 1, 1994, letter to defense counsel, he demands that his trial attorneys argue motions for judicial recusal, prosecutorial misconduct, the admissibility of evidence, among other things, complete with citation to case law on the subjects.  (*See*, *e.g*., Pet. Memo, Ex. Q).

A competency evaluation was conducted on February 2, 1993. (*See* Trial Tr. Vol. 10, 1041). Dr. Hutt's affidavit was sworn on May 17, 1993, prior to Petitioner's trial in this case. (*See* Pet. Memo, Ex. T). Dr. Hutt opined that Petitioner was having a typical reaction to too much Dilantin, and he opined that Petitioner would be unable to assist in his own defense until the proper dosage level was determined. (*Id.*). Dr. Hutt stated that he could not assess Petitioner's competency, however, until he had the opportunity to review test results and re-examine Petitioner. (*Id.*). As the Mississippi Supreme Court found, Petitioner presented no evidence of the dosage of medication he was on at the time of trial, how that level of medication would have affected him, and an opinion that would alter the previous finding of competency. The Court determines that as Petitioner has not shown prejudice as a result of trial counsel's failure to secure a competency determination prior to trial, the decision of the Mississippi Supreme Court does not run afoul of *Strickland* or its progeny. Therefore, this claim shall be dismissed.

F. Failure to Prepare and Present Important Motions Prior to Trial

1. Indictment

Petitioner first argues that trial counsel performed ineffectively in failing to challenge Petitioner's defective indictment prior to trial, as the portion of the indictment charging him with habitual offender status was attached to a separate page after the signature of the grand jury and after the phrase "against the peace and dignity of the state." (Pet. Memo 131-32, Ex. N). Petitioner argues that the Mississippi Constitution requires that a criminal indictment conclude with the words "against the peace and dignity of the state," by which the State created a liberty interest of which he was deprived through counsel's ineffectiveness. (Pet. Memo 132-33); *see also* Miss. Const., art. 6, § 169. Petitioner also argues that the indictment should have been challenged

based on the fact that the jury foreman was the brother-in-law of State Highway Safety Patrol Investigator Jim Wall, who was a key witness for the State during grand jury proceedings and at trial. (Pet. Memo 133).

On post-conviction review, the Mississippi Supreme Court considered whether counsel was ineffective in (1) failing to object to the indictment as facially invalid; and (2) failing to object that one of the members of the grand jury was related to a witness for the prosecution. *Crawford II*, 867 So. 2d at 210. First, the court noted it had addressed the validity of Petitioner's indictment on appeal and determined Petitioner was not prejudiced. *Id.* Next, the court found that a member of the grand jury's relation to the victim is not alone grounds for disqualification, such that it failed "to see how it would be any less permissible for one related to a witness to serve on a grand jury." *Id.* at 210. The Court also noted that Petitioner had written a letter to trial counsel around the time of his trial agreeing with trial counsel's decision not to challenge the indictment. *Id.* The court found, therefore, that Petitioner could not demonstrate deficiency in trial counsel's performance. *Id.*

Petitioner has provided no support for his claim that a relative to a witness can not serve on a grand jury. Therefore, he has failed to demonstrate the decision on the Mississippi Supreme Court with regard to this issue is unreasonable. *See, e.g., Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (absent a specific showing of how the alleged omissions were deficient and how they prejudiced petitioner's right to fair trial, there is no merit to a claim of ineffective assistance of counsel). Next, the Court notes that Petitioner's indictment does include an habitual offender portion after the grand jury foreman's signature. (*See, e.g*, Trial Tr. Vol. 1, 11-13). Mississippi law requires that a criminal indictment conclude with the phrase "against the peace and dignity of

the state." Miss. Const., art. 6, § 169. In *McNeal v. State*, 658 So. 2d 1345, 1350 (Miss. 1995), the Mississippi Supreme Court vacated a defendant's habitual offender status, as the indictment against him did not conclude with the "against the peace and dignity of the state" language. However, *McNeal* was not the law at the time of Petitioner's trial, so trial counsel can not be deemed deficient for failing to litigate the issue. *See Smith v. Anderson*, 199 F.3d 439 (5th Cir. 1999) (counsel not deficient for failing to challenge indictment based on decision in *McNeal*, as the case was not decided at the time of inmate's trial in 1992 and, therefore, no clear basis for objection existed). The indictment otherwise included the "against the peace and dignity of the state" language after each individual count of the indictment, which noted that Petitioner was being indicted as an habitual offender. The Mississippi Supreme Court has approved this procedure and distinguished it from *McNeal*. *See Earl v. State*, 672 So. 2d 1240, 1244 (Miss. 1996). Additionally, Petitioner informed his attorneys that he agreed with the decision not to challenge the sufficiency of the indictment. (*See* Pet. Memo, Ex. Q and R. Memo, Ex. C). Petitioner has not demonstrated an entitlement to relief, and this claim shall be dismissed.

2. Prior Bad Acts

Petitioner argues that trial counsel performed ineffectively in failing to move to suppress "highly inflammatory, unsubstantiated, prior bad acts of Petitioner," such that counsel's failure may serve as "cause" to overcome a procedural default. (Pet. Memo 133-34). The Mississippi Supreme Court considered this claim on post-conviction review, and the court determined that a defense of insanity opens the door "for the admission of evidence of every act of the accused's life relevant to the issue of sanity and is admissible in evidence." *See Crawford II*, 867 So. 2d at 210-11 (citing *McLeod v. State*, 317 So. 2d 389, 391 (Miss. 1975)). The court found that Petitioner had

failed to demonstrate counsel's deficient performance, as he had failed to demonstrate that any of the evidence was inadmissible. *Id.* at 211.

In Mississippi, "[w]hen the defense is insanity, either general or partial, the door is thrown wide open for the admission of evidence of every act in the accused's life relevant to the issue of insanity and is admissible in evidence." *McLeod v. State*, 317 So. 2d 389, 291 (Miss. 1975). As the State was entitled to rebut Petitioner's insanity defense with some of Petitioner's past criminal history, trial counsel made a strategic decision to introduce the history themselves to support Petitioner's claim of pervasive mental illness. Petitioner has not shown that the Mississippi Supreme Court's resolution of this claim warrants relief under the AEDPA.

3. Statements to Law Enforcement

Petitioner argues that trial counsel performed ineffectively in failing to move in writing for the suppression of Petitioner's statements to law enforcement. (Pet. Memo 134). Petitioner argues trial counsel's attempts to have the statements suppressed under the Sixth Amendment were inadequate, and that trial counsel failed to even argue Petitioner's Fifth Amendment and *Miranda* rights. (Pet. Memo 134, 135). Petitioner also notes that trial counsel failed to subpoena William Fortier and Shawn Akins for the hearing or otherwise investigate how the F.B.I. procured his mental health records. (Pet. Memo 135-36).

On post-conviction review, the Mississippi Supreme Court noted that Petitioner cited no support for his claim that the suppression motion should have been in writing, and it found Petitioner had failed to demonstrate deficiency based on trial counsel's ore tenus, rather than written, motion. *Crawford II*, 867 So. 2d at 211. In these proceedings, Petitioner has offered no support for his contention that trial counsel was ineffective in failing to submit to the trial court a

72

written motion to suppress his statements. Therefore, this claim shall be dismissed. See *Mitchell v. Esparaza*, 540 U.S. 12, 17 (2003) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous."). Moreover, with regard to Petitioner's Fifth Amendment claims, seven officers testified that Petitioner was given *Miranda* warnings, that he did not request an attorney, and that he led investigators through the dense woods to Kristy Ray's body. No medical evidence was presented at the suppression hearing that he needed medical treatment, and there was extensive testimony that he was lucid and responsive during questioning. (*See, e.g.*, Trial Tr. Vol. 1, 38, 39-40, 40-41, 43, 53, 55, 57, 60, 61-62, 65, 75, 76, 86, 86-87, 116, 119, 120, 133, 134-35). The determination that the confession was admissible was upheld on appeal. Assuming, *arguendo*, any deficient performance by trial counsel, Petitioner has not demonstrated prejudice from trial counsel's failure. This claim shall be dismissed.

4. Bench Trial

Petitioner argues that trial counsel was ineffecive in failing to move for a bench trial due to the pervasive publicity throughout North Mississippi. (Pet. Memo 136). Petitioner argues that trial counsel never informed him that he could waive his right to a jury trial, which he argues deprived him of his right to consider available strategies and exemplifies the ineffective assistance he received. (Pet. Memo 136-37). The Mississippi Supreme Court considered this claim on post-conviction review and determined Petitioner failed to demonstrate deficiency on the part of trial counsel, as there is no right under the Sixth Amendment to a bench trial. *Crawford II*, 867 So. 2d at 211. In his federal habeas proceedings, Petitioner provides no support for his contention that he was never informed that he had a right to a bench trial. Moreover, there is no constitutional right

to a bench trial.  *See Singer v. United States*, 380 U.S. 24, 34 (1965) (accused has no right to bench

trial despite capacity to waive right to jury trial).  Petitioner is not entitled to relief on this claim.

5.  Ex Parte Application for Expert Funds

Petitioner next argues that trial counsel failed to adequately litigate his pre-trial motion for

permission to proceed ex parte on application for expert funds, which was summarily denied by the

trial court without argument.  (Pet. Memo 137).  Petitioner maintains that trial counsel's failure to

appeal the issue and receive funding resulted in ineffective psychiatric testimony and an ineffective

insanity defense.  (Pet. Memo 137-40).  The Mississippi Supreme Court noted that in his post-

conviction petition, Petitioner identified "the specific expert he wished to obtain and that expert

appeared and testified at his trial.  His need to proceed ex parte was rendered moot.  Since the

claim was moot, Crawford is unable to show any prejudice from the failure to appeal the petition."

*Crawford II*, 867 So. 2d at 211.

Petitioner cites to several cases to argue that he had the right to an ex parte application for

expert funds to avoid disclosing to the prosecution confidential work-product information and

making the proceeding adversarial in nature.  *See, e.g., United States v. Sutton*, 464 F.2d 552, 553

(5th Cir. 1972) (per curiam) (court held that a defendant should not have to compromise his defense

by revealing the names of potential witnesses or the type of information sought by the

investigation); *United States v. Edwards*, 488 F.2d 1154, 1162 (5th Cir. 1974) (applications for

expert assistance must be held ex parte because dissemination of information critical to defense

permits government to enjoy unauthorized discovery forbidden under concept of criminal

procedure).  However, the record makes clear that Petitioner's application for funds was made to

ensure that Dr. Webb would be compensated for any additional expenses incurred in connection

with testifying at Petitioner's trial. (*See, e.g.*, Trial Tr. Vol. 5, 152-54). Dr. Webb had been retained by Petitioner's family for an evaluation, and Dr. Webb had initially performed those services at the family's expense. (*Id.* at 154). On February 2, 1994, while pre-trial motions were being heard, trial counsel informed the court that they wished to use the services of both Dr. Webb and Dr. Russell. (*Id.* at 152). The issue before the trial court was whether trial counsel should be allowed to proceed ex parte if Dr. Webb required additional compensation. (*Id.* at 152-53). Additionally, Petitioner had filed his notice of an insanity defense on January 10, 1994. (See Trial Tr. Vol. 1, 30). Petitioner served the ex parte motion for funds on the prosecution. (*See* Trial Tr. Vol. 2, 184-98). Petitioner was not forced to reveal any confidential work-product information, and he received the requested expert assistance. This claim shall be dismissed.

G. Failure to Preserve Petitioner's Right to an Effective Opening Statement

Petitioner argues that trial counsel rendered ineffective assistance when he conceded Petitioner's guilt in his opening statement. (Pet. Memo 141-42). Petitioner argues that trial counsel's opening suggested to the jury that Petitioner was a danger to society, that he was violent toward women, that he was guilty, and that he was insane. (Pet. Memo 142). Citing *Florida v. Nixon*, 543 U.S. 175, 186 (2004), Petitioner argues that trial counsel's opening statement was per se ineffective assistance of counsel. (Pet. Memo 142). On post-conviction review, the Mississippi Supreme Court found Petitioner's argument factually inaccurate. *Crawford II*, 867 So. 2d at 212. The court found that the record showed counsel "conceded underlying facts, yet at all times argued that Crawford was *not* guilty by reason of insanity. This Court has recognized the strategic prudence of admitting underlying facts while denying guilt and found that such conduct does not constitute ineffective assistance of counsel." *Id.*

In *Florida v. Nixon*, the United States Supreme Court reversed the Florida Supreme Court's judgment that conceding a defendant's guilt of murder during the guilt phase of trial without defendant's consent was per se ineffective assistance of counsel. *See* 543 U.S. at 178. The Court there noted that Nixon's trial was not the functional equivalent of a guilty plea, and that the case was fully presented to the jury. *Id.* at 188-89. The Court determined that counsel in that case made a strategic choice to concede guilt in order to focus on mitigating factors at the penalty phase. *Id.* at 191-92. Here, trial counsel repeatedly informed the jury that he would explain the "why" of the crimes charged against Petitioner, and the "why" was Petitioner's alleged mental illness. Trial counsel presented a defense that Petitioner was not guilty by reason of insanity, and Petitioner has failed to demonstrate that the decision of the Mississippi Supreme Court on this issue warrants relief under the AEDPA.

H. Failure to Prevent Admission of Prior Bad Acts

Petitioner argues that trial counsel failed to prevent the improper admission of his prior bad acts, both substantiated and unsubstantiated, which violated his right to due process. (Pet. Memo 142). First, Petitioner maintains that trial counsel failed to demand a hearing on the admissibility of the prior bad acts that were to be used against him, nor did counsel file any pre-trial motions regarding such. (Pet. Memo 143). Second, Petitioner argues that trial counsel failed to object to "bad act" testimony given by Agent Summerlin, Dr. Stanely Russell, Dr. Lott, and Petitioner's father. (Pet. Memo 143-48). Petitioner argues that evidence of Petitioner's prior trials, his violence toward his ex-wife, an alleged incident involving his cousin, and evidence that he had been charged with a prior rape and kidnapping were all presented to the jury because trial counsel failed to object to the testimony. Petitioner argues that as a result, he "was presented to the jury, by

his own defense counsel and though his own family members at times, to be a psychotic, habitual, predator of women, deserving of the death penalty." (Pet. Memo 148).

This claim was presented as two separate claims on post-conviction review. The Mississippi Supreme Court first found that Petitioner had failed to cite any authority for his claim that it is ineffective assistance for counsel to fail to insist on a pre-trial hearing regarding the admissibility of prior bad acts and determined it could not find counsel deficient for the failure. *Crawford II*, 867 So. 2d at 213. The court next considered whether counsel performed ineffectively in failing to object to prior bad act testimony. *Id.* The court noted that Agent Summerlin never used the word "trial" in his testimony to refer to the assault and rape trial, but rather, he referenced Petitioner's "upcoming event." *Id.* The court determined Agent Summerlin's testimony was not evidence of a prior bad act. *Id.* The court also considered whether the prosecution improperly elicited inadmissible testimony from Petitioner's father and Dr. Russell, and it found that "in each instance, the prosecution performed this questioning on the cross examination of a witness that the defendant was using to establish the insanity defense and, as such, prior bad act evidence became admissible for challenging this defense." *Id.* The court found that as the evidence was admissible, Petitioner could not demonstrate counsel performed deficiently. *Id.*

The factual findings of the Mississippi Supreme Court are supported by a reading of the record. Petitioner has not demonstrated that trial counsel made an unreasonable strategic decision in failing to object to the complained-of evidence, given the fact that the defense was insanity. Moreover, defense counsel used these prior acts to support the theory that Petitioner is severely

mentally ill.  Petitioner has not demonstrated that the Mississippi Supreme Court's decision warrants relief under the AEDPA, and this claim shall be dismissed.

I. Failure to Require Court to Conduct Hearing to Determine Admissibility of DNA Evidence

At trial, defense counsel filed a motion in limine to prevent the introduction of DNA evidence, which was denied by the trial court.  Petitioner argues that counsel performed ineffectively in failing to insist upon a hearing on the motion, as DNA was "brand new" and confusion existed in courts as how to measure the admissibility of scientific evidence.  (Pet. Memo 148-50).  Petitioner also appears to argue that Julie Ann Cooper, who testified at trial regarding the DNA evidence, lacked the educational background and specific training necessary to render an expert opinion on the evidence in the case.  (Pet. Memo 150).

On post-conviction review, the Mississippi Supreme Court considered Petitioner's claim that counsel was ineffective in failing to require that the trial court conduct a hearing on the admissibility of DNA evidence pursuant to the standards set forth in *Polk v. State*, 612 So. 2d 381 (Miss. 1992).  *See Crawford II*, 867 So. 2d at 213.  The court found it "apparent" that trial counsel moved to prevent the introduction of the evidence, and that the court denied the motion after hearing arguments and considering the requirements of *Polk* prior to ruling.  *Id*.  The court noted that it affirmed the denial of the motion on direct appeal, and Petitioner had failed to allege what further action counsel should have taken.  *Id*.  The court determined that Petitioner had failed to demonstrate either deficient performance by trial counsel or resulting prejudice, and it rejected Petitioner's claim.  *Id*. at 213-14.

At trial, defense counsel requested a hearing outside of the jury's presence to object to Ms. Cooper's testimony.  (*See* Trial Tr. Vol. 8, 736).  Trial counsel argued that the explanation for the

DNA match in this case was not "generally accepted" by the relevant scientific community, and that without testimony as to the significance of a DNA "match," the evidence would not be helpful to determine any factual dispute and, therefore, inadmissible.  (*Id.* at 739-40).  The prosecution argued that the evidence was permissible under *Polk v. State*.  (*Id.* at 740).   The Court denied the motion in limine after hearing argument and reviewing the case of *Polk v. State*.  (Id. at 741).   This Court determines that as trial counsel did litigate the issue, Petitioner may not establish an entitlement to federal habeas relief based on the Mississippi Supreme Court's decision.  As the underlying challenge to the admissibility of the evidence was held without merit on direct appeal, Petitioner can likewise demonstrate no prejudice.  *See Crawford I*, 716 So. 2d at 1044-46.  This claim shall be dismissed.

J.  Stipulating to Results of State's "Expert" Evidence

Petitioner maintains that trial counsel's failure to cross-examine Joe Andrews, a forensic scientist with the Mississippi Crime Lab and the State's expert witness, was essentially a stipulation that the State's evidence was accurate and Petitioner guilty.  (Pet. Memo 150-51).  At trial, Mr. Andrews testified that he compared the hairs found on various items of evidence to the known hair samples of both Kristy Ray and Petitioner.  (*See, e.g.*, Trial Tr. Vol. 7, 581-594).  The jury was informed that Petitioner had confessed that Kristy Ray was in the Hopper Barn with him.  (*See, e.g.*, Trial Tr. Vol. 8, 691).  On post-conviction review, the Mississippi Supreme Court found that the complained-of testimony and evidence showed only that Petitioner and Kristy Ray had been in the barn together, which Petitioner had already admitted.  *See Crawford II*, 867 So. 2d at 214.  The Court determines that the finding is supported by the record, and that Petitioner has

failed to demonstrate that the Mississippi Supreme Court's rejection of this claim warrants relief under the AEDPA. This claim shall be dismissed.

K. Failure to Secure Independent Experts

Petitioner argues that trial counsel failed to request funds for expert assistance in areas other than psychiatry, and he notes that the latent fingerprints removed from Kristy Ray's car and the window pane of her home were never compared to Petitioner's fingerprints. (Pet. Memo 151-52, Ex. W and X). Petitioner argues trial counsel was ineffective in failing to secure the services of an independent expert that could have discovered exculpatory evidence. (Pet. Memo 152).

The Mississippi Supreme Court considered Petitioner's claim that counsel rendered ineffective assistance in failing to secure funds for an independent expert analysis of the fingerprints recovered as evidence in this case. *Crawford II*, 867 So. 2d at 214. The court stated that Petitioner's claim of error essentially alleged "that the outcome of the trial might have been different. However, *Strickland* requires a showing that the verdict would have been different; and therefore, the claim is without merit." *Id.* This Court notes that it is unaware of the distinction the Mississippi Supreme Court was trying to draw with differentiating "outcome" from "verdict," but the Court does not find that such a distinction exists. However, the issue before the court is whether the decision reached by the court was unreasonable. The Court finds that it was not.

During the course of investigating this case, investigators recovered latent fingerprints from the window pane of Kristy Ray's home and from her car. (Pet. Memo 151-52, Ex. V, W, and X). As Respondents note, even if it could conclusively be shown that Petitioner's fingerprints were not on either the car or the window, a different result is not probable. First, Petitioner has not demonstrated that the latent prints were usable or could have been read if an expert had been

requested and provided.  Second, the prosecution had DNA evidence linking Petitioner to this crime and a confession.  Petitioner's claim speculates a different result, but it does not create a reasonable probability of one.  *See Collier v. Cockrell*, 300 F.3d 577, 587 (5th Cir. 2002) (conclusory allegations of ineffective assistance do not raise constitutional issues in federal habeas corpus proceeding).  This claim shall be dismissed.

L.  Failure to Object to Inadmissible Questions and Evidence

Petitioner alleges that trial counsel performed ineffectively in failing to object to questions asked by the prosecutor that served no purpose but to elicit prejudicial, inflammatory testimony. (Pet. Memo 152-54).  Specifically, he argues that trial counsel failed to object to Agent Jackson's testimony that he had two daughters close to Kristy Ray's age, and that one of those daughters bore a strong resemblance to Kristy Ray. (Pet. Memo 152).  Second, he argues that the prosecutor elicited testimony from Agent Summerlin about a statement Petitioner had attributed to Kristy Ray, and the prosecutor asked if Kristy had made the statement before Petitioner killed her.  (Pet. Memo 153).

The Mississippi Supreme Court considered Petitioner's claim on post-conviction review. *See Crawford II*, 867 So. 2d at 214.  First, the court determined that Agent Jackson's statement that he had a daughter close to Kristy's age was merely "an indication of his desire to find the victim as soon as possible in hopes that she might still be alive." *Id*. at 214.  Therefore, the court determined counsel was not deficient in failing to object to the testimony. *Id.*  Second, it determined that Agent Summerlin's statements were "certainly objectionable," but that Petitioner provided no authority for his argument that failing to object to either of these statements was ineffective assistance. *Id.*  The court otherwise noted that trial counsel demonstrated a "vigorous

participation" in Agent Summerlin's testimony, as counsel made several objections during its course. *Id*. The court also found Petitioner had not demonstrated prejudice as a result of the statements, as he failed to demonstrate a reasonable probability that the jury would have returned a different verdict if trial counsel had objected and had the testimony stricken from the record. *Id.*

Petitioner's claim is one of ineffective assistance of counsel based upon counsel's failure to object to prosecutorial misconduct. Federal habeas relief does not lie on the basis of prosecutorial misconduct unless the comments to the jury "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v DeChristoforo*, 416 U.S. 637, 643 (1974)). Unfairness warranting federal habeas relief is demonstrated by showing that a reasonable probability exists that Petitioner would not have been sentenced to death absent the prosecutor's comments. *See Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002)*; Barrientes v. Johnson*, 221 F.23d 741, 753 (5th Cir. 2000); *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986). The Court does not find that the comments elicited from Agent Jackson or the prosecutor's reference to Petitioner killing the victim were so egregious as to amount to a denial of due process. Moreover, the evidence against Petitioner in this case was overwhelming, thereby supporting a conclusion that he suffered no prejudice as a result of trial counsel's failure to object. *See, e.g., United States v. Royal*, 972 F.2d 643, 651 (5th Cir. 1992) (overwhelming evidence of guilt supports a finding that Petitioner suffered no prejudice as a result of counsel's performance). This claim shall be dismissed.

M. Trial Counsel Injected Prejudicial and Otherwise Inadmissible Evidence

First, Petitioner argues that some of the most damaging testimony admitted at trial was introduced by his own counsel, such that counsel became the equivalent of a "second prosecutor."

(Pet. Memo 154-55). Petitioner contends that counsel (1) introduced Petitioner's prior bad acts by questioning a potential juror during voir dire about his father's service as a juror in one of Petitioner's prior trials; (2) questioned Agent Jackson about the facts linking Petitioner to Kristy Ray's abduction, which elicited comments from Agent Jackson about Petitioner's pending trial for assault and his propensity for violence; (3) elicited from Dr. Russell on direct examination the fact that Dr. Russell had testified against Petitioner as a witness for the State during a previous trial; and (4) elicited from Dr. Lott that Petitioner had a history of repeated violent acts toward women. (*See* Pet. Memo 155-57).

Second, Petitioner argues that defense counsel called Petitioner's former attorney, Mr. Fortier, and questioned him about the events that led Mr. Fortier to turn over Petitioner's mental health records to the F.B.I., which elicited otherwise inadmissible testimony about the ransom note found by Petitioner's family. (Pet. Memo 157-58). Petitioner argues the given testimony indicated that the murder was premeditated and destroyed his insanity defense, as it conflicted with Dr. Russell's testimony that Petitioner was in a state of psychogenic amnesia at the time of the murder. (Pet. Memo 159-60).

On post-conviction review, the Mississippi Supreme Court found that the discussion of Petitioner's prior bad acts during Dr. Russell's testimony was necessary in support of Petitioner's defense of insanity. *Crawford II*, 867 So. 2d at 215. The court found that no facts about Petitioner's prior trial was revealed during voir dire, and that Petitioner was not prejudiced by the "near slip-up." *Id.*[16] The court otherwise noted that the bad acts would have "eventually come

---

[16] The court also noted that the prosecution prevented trial counsel's interjection of Petitioner's previous trial by objecting to trial counsel's questioning of the potential juror. *See Crawford II*, 867 So. 2d 196, 215 and n.10.

out," as Petitioner's defense was insanity. *Id.* The court also determined that the context of Agent Jackson's testimony showed that trial counsel intentionally elicited information from Agent Jackson to demonstrate the involuntary nature of Petitioner's confession. *Id.* Given the wide latitude afforded to strategic decisions, the court found no deficiency in trial counsel's actions. *Id.* The court also rejected Petitioner's claim that trial counsel's questioning that elicited comments about the ransom note was improper, and it determined that trial counsel did not open the door to questioning about the note. *Id.* The court reiterated that a defense of insanity makes any evidence that would rebut the defense both relevant and admissible. *Id.* The court found that trial counsel's goal was to attack Petitioner's confession, and it was therefore necessary to call witnesses to attempt to demonstrate that Petitioner's mental health records were obtained using false pretenses. *Id.*

Trial counsel's strategy to attack the legality of Petitioner's confession necessitated the testimony of Agent Jackson and Mr. Fortier regarding Petitioner's mental health records. Testimony regarding the ransom note would have been admissible, regardless of whether it was introduced by trial counsel. The testimony given by Dr. Russell was necessary to establish Petitioner's extensive history of mental illness that supported a defense of insanity. In light of the evidence against Petitioner, trial counsel made reasoned decisions about the best way to attack the evidence and use the incriminating evidence to establish a defense. Petitioner has not demonstrated that the decision of the Mississippi Supreme Court warrants relief under the AEDPA, and this claim is dismissed.

N. Failure to Ensure Attendance of Witnesses Crucial to the Defense

Petitioner argues that his illegally obtained confession was entered into evidence against him, in part, due to trial counsel's failure to subpoena either Mr. Fortier or Mr. Atkins to the omnibus hearing to testify. (Pet. Memo 160-61). The Mississippi Supreme Court found that the record demonstrates that the trial court was willing to reopen the motion when the witnesses were in attendance, and the issue was addressed by the witnesses at a later time. *Crawford II*, 867 So. 2d at 215-16. A reading of the record supports that finding. The trial court stated that defense counsel could reassert the suppression motion when both Mr. Fortier and Mr. Atkins were available, and both Mr. Fortier and Mr. Akins testified at trial. (*See*, *e.g.*, Trial Tr. Vol. 4, 138-141). This claim shall be dismissed.

O. Failure to Present Adequate Closing Argument At Guilt Phase

Petitioner maintains that trial counsel presented an inappropriate, inadequate, and ineffective closing argument at the guilt phase of trial. (Pet. Memo 162). Petitioner argues that counsel referred to Petitioner as a "monster" who was dangerous to society and a burden to his family, and that he conceded Petitioner's guilt by arguing to the jury that Petitioner was insane and a danger to all women. (Pet. Memo 162-63). On post-conviction review, the Mississippi Supreme Court found that the purpose of "counsel's fourteen page closing" was "to make one last effort to argue that [Petitioner] was not guilty by reason of insanity." *Crawford II*, 867 So. 2d at 216. The court noted that Petitioner had presented it with no support for his allegation that trial counsel "must describe his client in a pleasant manner at closing argument." *Id*. The court also found that it was trial counsel's goal to have Petitioner appear to be a "monster," as the defense strategy was that Petitioner was not guilty because he was legally insane. *Id.* The court found trial counsel

never conceded guilt in Petitioner's case, and it determined Petitioner had not shown a deficient performance by trial counsel.  *Id.*

The Court notes that the statements complained of were given by Mr. Pannell, the counsel with which Petitioner alleges the existence of a "mutual dislike."  Again, the Court notes that Petitioner presented an insanity defense.  Trial counsel began his closing with reminding the jury that the defense was there to explain the "why" of the crime.  (*See* Trial Tr. Vol. 11, 1178). Defense counsel went back through the trial testimony, highlighting for the jury the testimony that would support a determination that Petitioner was insane at the time of the crime.  During that closing, he addressed what he believed might be a rational juror fear, that is, what if Petitioner was found not guilty and that "monster" was turned out on society.  (*See id.* at 1189).  He addressed that concern by discussing the State's burden of proof, reasonable doubt, and by informing the jury that if Petitioner was certified to be insane he would be confined and not be released into the community.  (*See id.* at 1190-91).  Trial counsel's strategy may not have been successful, but Petitioner has not demonstrated that it was an unreasonable strategy given the evidence against Petitioner and the defense of insanity.  This claim shall be dismissed.

### XV.  Ineffective Assistance of Counsel at Sentencing

A.  Failure to Investigate and Present Significant Evidence in Mitigation

Petitioner argues that trial counsel failed to conduct any reasonable investigation to prepare for the sentencing phase of Petitioner's trial, such as securing pertinent records or interviewing potential witnesses prior to trial.  (Pet. Memo 169-71).  In addition to a general allegation that trial counsel performed ineffectively, Petitioner makes several specific allegations of deficient performance by trial counsel.

First, Petitioner argues that trial counsel failed to investigate and present mitigating evidence of Petitioner's mental illness and emotional disturbances. (Pet. Memo 172). Petitioner notes that Deidre Enright, a staff attorney for the Capital Defense Resource Center, took it upon herself to investigate Petitioner's background and provide the gathered information to defense counsel. (Pet. Memo 172 and Ex. G and Z). Petitioner maintains that Ms. Enright's investigation included interviewing twelve persons, and that investigation yielded a wealth of information about Petitioner's long history of mental illness. (Pet. Memo 173-75). Among other things, Ms. Enright was informed that Petitioner suffered debilitating headaches, would disappear for days at a time, suffered from night terrors, that he colored out the faces of women in his grandmother's yearbook as a child, that he was suspected to be the perpetrator of a sexual assault against his cousin, that he repeatedly committed violent acts against his ex-wife, and that he threatened to kill his mother. (Pet. Memo 173-75). In addition, Petitioner alleges that trial counsel failed to present his familial history of mental illness. (Pet. Memo 175). Petitioner concedes that some mental health evidence was presented in mitigation, but he alleges that defense counsel retained experts who contradicted each other's findings and diagnosed Petitioner with competing conditions. (Pet. Memo 177). Petitioner argues that trial counsel failed to prepare them to testify, and that they were unprepared to testify. (Pet. Memo 177-79). Petitioner also notes that it was never revealed at trial that Petitioner might have organic brain damage as a result of an accident that occurred when he was a teenager. (Pet. Memo 179 and Ex. T). Petitioner therefore argues that trial counsel was ineffective in the presentation of the available mitigating evidence. (Pet. Memo 177).

Second, Petitioner argues that trial counsel failed to investigate and present evidence of physical and sexual abuse Petitioner allegedly suffered. (Pet. Memo 180). Petitioner argues that

Petitioner's ex-wife noted in her interview with Ms. Enright that "people were stating that Petitioner had raped his mother and that she had sexually abused him as a child." (Pet. Memo 180, *see also* Ex. H). Petitioner alleges that he also informed defense counsel that he was beaten by his stepmother. (Pet. Memo 180). Petitioner argues that it is clear that defense counsel was aware of this information, as documented communications between Ms. Enright and defense counsel, Mr. Pannell, establish that. (Pet. Memo 180, *see also* Ex. Z).

Third, Petitioner argues that there was significant evidence of Petitioner's good behavior in prison that would have provided support for a jury determination of a sentence less than death, but that trial counsel failed to interview employees at the penitentiary to deliver a more convincing picture of Petitioner's adaptation to prison life. (Pet. Memo 181). Fourth, Petitioner argues that trial counsel failed to investigate and present evidence of Petitioner's remorse, which he argues was evidenced by the fact that he attempted suicide several times while in custody and awaiting trial. (Pet. Memo 182). Finally, Petitioner argues that trial counsel failed to investigate and present evidence concerning his long history of substance abuse. (Pet. Memo 182).

On post-conviction review, the Mississippi Supreme Court noted that the United States Supreme Court had recently decided the case of *Wiggins v. Smith*, 539 U.S. 510 (2003), in which a death-sentenced inmate had alleged ineffective assistance of counsel because of trial counsel's failure to investigate and present mitigating evidence at the sentencing portion of his trial. *Crawford II*, 867 So. 2d at 217. The court noted that *Wiggins*, citing *Strickland*, reiterated that courts analyzing claims based on trial counsel's decision not to introduce evidence should focus on whether trial counsel conducted a reasonable investigation in deciding not to introduce particular evidence in mitigation. *Id.*, *see also Wiggins*, 539 U.S. at 523. The court determined that its duty

was to give a "context-dependent consideration of the challenged conduct" as counsel would have seen it at the time, and to assess whether counsel "exercised reasonable professional judgment in conducting" the investigation under the then prevailing professional norms. *Id.*

The court first noted that Petitioner did not allege in his post-conviction petition any information that trial counsel did not have knowledge of, nor did he provide the necessary affidavits addressing the available mitigating information trial counsel failed to investigate and present. *Id.* at 217-18. The court found that Petitioner's "glaring lack of evidence" of prejudice rendered the need to examine the reasonableness of trial counsel's investigation unnecessary. *Id.* at 218. Therefore, the court determined that due to Petitioner's inability to challenge the investigation, it had to judge counsel's investigation complete and give deference to claims of trial strategy. *Id.* The court determined that where a petitioner offers the court a "sketchy outline" of counsel's investigation without any knowledge of the impressions or reasons behind the decisions made by trial counsel, it applies a presumption that trial counsel considered the evidence and made a strategic decision that it was in his client's best interest not to bring it out at trial. *Id.* The court otherwise found that the evidence mentioned by Petitioner, had it been presented at sentencing, was not of such a nature as to cast doubt on the jury's verdict. *Id.*

As Respondents note, Petitioner has not provided this Court with any affidavit from any person stating what information should have been, but was not, presented at trial. (*See* R. Memo 196). The majority of the information Petitioner alleges was omitted from trial comes from the reports of Ms. Enright. She sent a report to Dr. Webb based on her investigations, and a summary of her conversation with Petitioner to Mr. Pannell, which was sent to the director of the Capital Defense Resource Center. (*See* Pet. Memo, Ex. G and Z). Respondents argue these are hearsay,

and that they otherwise do not support a claim of ineffective assistance of counsel, as it shows counsel was preparing for trial by discussing the case with other capital litigation attorneys and furnishing Dr. Webb with the investigator's findings. (*See* R. Memo 197 and n. 40).

Petitioner attaches to his memorandum in support of his petition for writ of habeas corpus a report from Deirdre M. Enright that was sent to Dr. Mark Webb on May 9, 1993. (*See* Pet. Memo, Ex. G). That report contains the information Ms. Enright obtained during the course of her investigation. Ms. Enright obtained Petitioner's medical records from the Northeast Mississippi Medical Center, which she requested on May 10, 1993. (*See* Pet. Memo, Ex. S). Ms. Enright also sent a letter to an attorney, Jim Craig, on April 2, 1993, in which she summarized her conversations with defense counsel Pannell. (*See* Pet. Memo, Ex. Z). At trial, Petitioner's case was built around his insanity defense, and his mental illness was the central theme in mitigation. At sentencing, Petitioner had the testimony of two experts, each of whom opined that Petitioner lacked responsibility for the crime. It is obvious from the testimony given that Dr. Webb had the benefit of Ms. Enright's investigation in formulating his clinical opinion. The jury heard testimony that Petitioner had repeated commitments and/or evaluations at various hospitals or mental health facilities, that he suffered from night terrors, that he had an unstable upbringing, that he had memory lapses and sudden mood swings, that he colored out faces of women in his grandmother's yearbooks, that he behaved irrationally at times, that he suffered headaches, that he had an excessive fear of the dark, and that his problems only got progressively worse as he aged. (*See, e.g.*, Trial Tr. Vol. 9 and Vol. 10, 832-834, 893, 896, 925-26, 929-30, 932-34, 936-40, 941-43, 959-60, 963-64, 978-985). Petitioner has not presented an affidavit from anyone who should have been called to testify in mitigation but who did not. Eleven witnesses testified for Petitioner during

the mitigation phase of trial.[17]   The only affidavit from a family member relevant to this issue is

that of Petitioner's father, Marion Ray Crawford, who states that trial counsel did not adequately

interview family members or witnesses.  (*See* Ex. P to Pet. Memo, Aff. of Marion Ray Crawford).

Mr. Crawford opined that had an effective investigation been conducted, it "would have uncovered

a substantial amount of evidence concerning my son's mental history which could have been used

during the penalty phase of the trial."  (*Id*.).   Petitioner has not shown what omitted information

should have been presented.

There is no support in the record for the allegations attributed to Petitioner's ex-wife about

abuse Petitioner suffered.  While Petitioner attributes the handwritten comments to her, the

attached document is not sworn, it does not contain Gail Crawford's name, and it does not identify

who made the alleged comments.  (*See* Pet. Memo, Ex. H).  These allegations are unsupported by

credible evidence, as are Petitioner's statements that he was beaten by his step-mother.  Other than

the handwritten notes of unknown origin or author, the only mention of such abuse is that which

Petitioner reported to Ms. Enright and which was summarized in her April 26, 1993 report to Mr.

Pannell regarding her interview with Petitioner.  (*See* Pet. Memo, Ex. G).  Likewise, there is no

indication that Petitioner suffers from organic brain damage.  In his report, Dr. Hutt merely opines,

without having evaluated Petitioner, that his seizures "could possibly be caused by organic brain

damage resulting from a severe head injury he suffered in his late teens," but that an "E.E.G." test

---

[17]Defense counsel called the following witnesses to testify in mitigation: (1) Marion Ray Crawford, Petitioner's father; (2) Dewey Crawford, Petitioner's grandfather; (3) Chlois Crawford, Petitioner's grandmother; (4) Johnny Ruth Smith, Petitioner's mother; (5) John Lee Montgomery, Petitioner's grandfather; (6) Martha Montgomery, Petitioner's grandmother; (7) Martha Crawford, Petitioner's stepmother; (8) Clint Crawford, Petitioner's half-brother; (9) Dr. Martin Webb, psychiatrist; (10) Dr. Stanley Russell, psychiatrist; and (11) Rebecca Crawford, Petitioner's sister.

would need to be performed. (Pet. Memo, Ex. T, Aff of Dr. Hutt). An electroencephalogram

("E.E.G.") was performed on Petitioner on May 4, 1993, and those results were normal. (*See* Pet.

Memo, Ex. S). Additionally, Petitioner has not presented the Court with proof that he has adapted

well to prison conditions. Dr. Russell gave testimony during the mitigation phase that Petitioner

could serve to benefit society if sentenced to life in prison, as he had observed Petitioner getting

other "psychiatrically disturbed inmates" to be compliant in their medications and behavior. (Trial

Tr. Vol. 12, 1294-95). However, Petitioner has provided the Court with no prison records or an

affidavit from prison officials suggesting he had good behavior in prison. Moreover, the fact that

Petitioner has attempted suicide is not necessarily indicative of remorse. Similarly, although

Petitioner's allegations of drug use were mentioned at trial, Petitioner has provided no support for

his allegations that he suffers from a long-tern drug abuse problem.

In short, Petitioner's previous commitments, his abnormal childhood behavior, his sudden

"snaps," and his previous experiences with "blackouts" were all there for the jury's consideration.

Petitioner's remaining allegations are conclusory and insufficient to support a claim of ineffective

assistance of counsel. *See, e.g., Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (absent

specific showing of how alleged omissions deficient and how prejudiced right to fair trial, there is

no merit to claim of ineffective assistance of counsel). This claim shall be dismissed.

B. Failure to Object to Improper Presentation of Evidence by Prosecution

Petitioner argues that trial counsel rendered ineffective assistance when he failed to object

to the introduction of his two prior felony convictions through the testimony of Jim Wall, as the

State should have introduced certified copies of the convictions to attempt to prove the existence of

the aggravating circumstance of a prior conviction involving violence to the person. (Pet. Memo

182-83).  On post-conviction review, the Mississippi Supreme Court noted that Petitioner cited no authority for his argument that the State was required to prove this particular aggravating circumstance through certified copies of his prior convictions.  *Crawford II*, 867 So. 2d at 216. The court otherwise determined Petitioner could not demonstrate prejudice as a result of trial counsel's failure to object to the use of Investigator Wall's testimony to establish the convictions, as "[w]ere this testimony objected to, the State could have used the same certified copies that were used and admitted into evidence at the hearing on [Petitioner]'s habitual offender status."  *Id.*

Petitioner cites no authority for his claim, and his claim is one of error in the application of State law that is not cognizable in a federal habeas proceeding.  *See, e.g., McGuire*, 502 U.S. at 67-68.  The Court finds that Petitioner has not otherwise demonstrated an entitlement to relief on this claim, and it shall be dismissed.

C.  Failure to Deal with Speculation of Parole

Petitioner maintains that he was prejudiced by trial counsel's failure to fully litigate the issue of parole at sentencing, as the jury might have selected a lesser sentence had it known that a sentence of life would mean life without parole.  (Pet. Memo 183).  During the course of Petitioner's trial, the fact that Petitioner would remain confined for life was mentioned numerous times.  (*See, e.g.*, Trial Tr. Vol.5, 395-96; Trial Tr. Vol. 12, 1229, 1357).  The jury in Petitioner's case was instructed that they could return a sentence of death or life without parole.  (*See, e.g.*, Trial Tr. Vol. 3, 275-279, 282; *see also* Instruction 2-A and Instruction 5).  The Mississippi Supreme Court's rejection of this claim does not warrant relief under the AEDPA.  *See Crawford II*, 867 So. 2d at 217.

D.  Failure to Develop and Present a Theme in Mitigation

Petitioner argues that in defense counsel's closing argument, he presented Petitioner as a monster who would be getting exactly what he wanted, if the jury sentenced him to death, and that he otherwise needed to be studied to prevent "other monsters." (Pet. Memo 183-84). Petitioner argues that defense counsel Pannell's comments ran afoul of the purpose of a case in mitigation, and that his closing otherwise conflicted with that of defense counsel Bell, who argued that the death penalty is morally wrong and does nothing to reduce crime. (Pet. Memo 184). The Mississippi Supreme Court rejected Petitioner's claim on post-conviction review, noting that he presented no pertinent authority for his argument. *See Crawford II*, 867 So. 2d at 217.

Admittedly, it would appear that referencing one's client as a dangerous monster might not be among the wisest of trial strategies. However, defense counsel was faced with the hurdle of attempting to save their client's life in light of overwhelming evidence that would support a finding that the death penalty was warranted. The mitigation case presented to the jury was that Petitioner suffered from extreme mental and emotional disturbances. Defense counsel Pannell argued that Petitioner's life would have value in prison, as he could be studied to determine how to best prevent tragedies similar to Kristy Ray's death in the future. (Trial Tr. Vol. 13, 1369-70). He argued that the State had already obtained justice, as Petitioner would spend the rest of his life confined and unable to harm anyone else. (*Id.* at 1370). Defense counsel Bell's argument attempted to persuade the jury that the death penalty served no moral or societal purpose in light of the fact that Petitioner would be locked away forever if a life sentence was returned. (Trial Tr. Vol. 13, 1360-67). The Court determines that there is no evidence to support a finding that trial counsel failed to investigate the available options for their case in mitigation. The "theme" was a plea for mercy.

Moreover, it was reasonable for defense counsel to address the evidence before the jury. *See Jones v. Jones*, 163 F.3d 285, 303 (5th Cir. 1998). Mr. Pannell did not perform ineffectively in arguing in a manner that acknowledged Petitioner's crime while asking that his life be spared. *See Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997) (counsel may properly concede jury would be justified in imposing penalty of death in order to establish credibility with the jury). Petitioner has not demonstrated an entitlement to relief on this claim, and it shall be dismissed.

E. Failure to Secure Time Necessary to Prepare Case

Petitioner argues that trial counsel failed to secure a limited continuance in order to prepare and present an effective case in mitigation, despite the fact that counsel admitted to the trial court that they were exhausted when urged to try to conclude the sentencing phase in one day. (Pet. Memo 185). On post-conviction review, the Mississippi Supreme Court rejected Petitioner's claim. It found that trial counsel requested an adjournment, which was granted by the trial court, and that "the penalty phase of trial did not begin until the following morning." *Crawford II*, 867 So. 2d at 216.

First, the Court notes that the Mississippi Supreme Court's finding is factually inaccurate. The sentencing phase began immediately after the close of the guilt phase.[18] Second, Petitioner's argument is misleading. At the close of the guilt phase, a ten minute recess was granted upon the State's request. (*See* Trial Tr. Vol. 12, 1222-23). When the sentencing proceedings began, both the State and defense counsel stated they were ready to proceed. (*Id.* at 1223). When trial counsel complained of exhaustion, it was upon defense counsel Bell's request to adjourn for the day

_____

[18] An adjournment was requested following the taking of testimony in the sentencing phase, which the trial court granted. (*See* Trial Tr. Vol. 12, 1320-24).

following the giving of all testimony in the sentencing phase before the trial court gave jury instructions and the attorneys gave closing argument. (*See id.* at 1320-24).

The sentencing phase of a capital murder trial "shall be conducted by the trial judge before the trial jury as soon as practicable." Miss. Code Ann. § 99-19-101. There is no indication that trial counsel was not ready to proceed with sentencing at the close of the guilt phase. Petitioner can not demonstrate that he was prejudiced by trial counsel's failure to seek and secure a continuance unless he establishes "a reasonable probability that the granting of a continuance would have permitted him to adduce evidence that would have altered the verdict." *McFadden v. Cabana*, 851 F.2d 784, 788 (5th Cir. 1988) (citation omitted). Petitioner has not demonstrated what a continuance would have accomplished, and he has not demonstrated that trial counsel was unprepared to go forward with the sentencing phase of the trial. Petitioner's conclusory allegation does not state a valid claim of ineffective assistance of counsel. *See, e.g., Miller*, 200 F.3d at 282. This claim shall be dismissed.

F. Failure to Present Effective Closing

Petitioner's contends that during closing argument Mr. Pannell referred to Petitioner as a "monster" and equated him with serial killers Ted Bundy, John Wayne Gacy, and Jeffrey Dahmer. (Pet. Memo 185). Petitioner maintains that the closing was not a plea for life, but a wholly inadequate plea that the jury not make Petitioner a celebrity by giving him the death sentence he wanted. (Pet. Memo 185-86). On post-conviction review, the Mississippi Supreme Court found that counsel did offer mitigating evidence through Petitioner's family members and expert testimony, and it found that co-counsel made "a strong argument in favor of life." *Crawford II*, 867 So. 2d at 218. The court found Petitioner was "expressing his displeasure with one member of

counsel's" strategy of closing argument, which it determined was an insufficient basis for a claim of ineffective assistance of counsel. *Id.*

In these proceedings, Petitioner merely argues that trial counsel should not have argued as he did but should have instead presented "the available mitigating evidence." (Pet. Memo 185-86). The jury rejected Petitioner's insanity defense at the guilt phase. It was reasonable for trial counsel to attempt to make the most of the available mitigating evidence without making arguments that would ring hollow with the jury. Trial counsel's strategy was to save his client's life by conceding how horribly Petitioner had made of mess of it through his mental illness. The fact that the strategy did not work is not ineffective assistance of counsel. This claim shall be dismissed.

G.      Failure to Prevent State from Misconduct in Closing

Petitioner alleges the prosecutor made improper arguments during his closing argument to which defense counsel ineffectively failed to object. (Pet. Memo 186-87). First, he argues that the prosecution informed the jury that it did not need to consider Petitioner's mental illness as a mitigating factor because Petitioner had already been declared sane. (Pet. Memo 187). Petitioner maintains this argument could have led a rational juror to conclude that he or she could not consider Petitioner's mental illness as a mitigating factor. (Pet. Memo 187). Next, Petitioner argues that the prosecutor urged the jury to consider facts not in evidence by informing the jury that Petitioner's mother had stated Petitioner prepared the ransom note found in the residence where Petitioner was living at the time of the crime. (Pet. Memo 187). Finally, Petitioner argues the prosecution improperly urged the jury to put themselves in the place of the victim. (Pet. Memo 187).

As to Petitioner's first allegation of error, the Mississippi Supreme Court found that the prosecutor's comments were rebuttal argument to Petitioner's contention that he lacked capacity. *Crawford II,* 867 So. 2d at 218. The court also noted that "[a]ttempting to disprove a mitigating factor is not the same as instructing the jury not to consider one." *Id.* (citing *Ladner v. State*, 584 So. 2d 743, 762 (Miss. 1991). The court also rejected Petitioner's argument that the prosecutor presented argument on evidence not in the record when he referenced the ransom note, as it was received into evidence at the close of the testimony of Petitioner's mother. *Id.* The court determined it was a reasonable inference from her testimony that Petitioner wrote the note, and it otherwise determined Petitioner had not demonstrated prejudice even if counsel could be deemed deficient for having failed to object to its introduction. *Id.* at 218-19. The court also rejected Petitioner's claim of ineffective assistance based on the prosecutor's request that the jury consider the last moments of Kristy Ray's life, as there was no "in the victim's shoes" argument made. *Id.* at 219.

Whether to object during the prosecution's closing during a capital murder trial is a matter of trial strategy. *See Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992). The jury was specifically instructed to consider as mitigating circumstances whether Petitioner committed the offense while "under extreme mental or emotional disturbance" and to consider whether his "capacity. . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." (*See* Trial Tr. Vol. 3, 277). The potential success of an ineffective assistance of counsel claim necessarily depends on the merits of the substantive claim that underlies the basis of the ineffective assistance claim. Otherwise, there is no prejudice. The Court has addressed Petitioner's allegations of prosecutorial misconduct and found that they do not

warrant relief.  Even if the court were to assume deficient performance by trial counsel, prejudice exists "only if, but for counsel's errors, there is a reasonable probability that the final result would have been different and confidence in the reliability of the verdict has been undermined." *Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005).   Petitioner has not demonstrated such prejudice, and this claim shall be dismissed.

## Conclusion

For the reasons set forth above, Petitioner has not demonstrated that his State court proceedings resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law, and the denial of his claims has not been shown to have been based on an unreasonable determination of facts in light of the evidence presented in the State court proceedings.  Accordingly, the Court **DENIES** federal habeas relief, and the instant petition shall be dismissed with prejudice.  All other pending motions are dismissed as moot.  A separate order in accordance with this opinion shall issue today.

**THIS** the __25th_____ day of September, 2008.


____/s/ Sharion Aycock_____
**U.S. DISTRICT JUDGE**